**WILLOWS WATER DISTRICT, a quasi-municipal corporation and political subdivision of the State of Colorado, Applicant and Defendant–Appellant/Cross–Appellee,**

v.

**MISSION VIEJO COMPANY, a California corporation, Highlands Ranch Development Corporation, a Colorado corporation, and Centennial Water and Sanitation District, a quasi-municipal corporation and political subdivision of the State of Colorado, Objectors and Plaintiffs–Appellees/Cross–Appellants,**

and

**Harold D. Simpson (substituted pursuant to C.A.R. 43(c)(1) as successor to Jeris A. Danielson), State Engineer, Appellee,**

and

**Alan D. Berryman, Division Engineer for Water Division No. 1, Appellee.**

No. 92SA205.

Supreme Court of Colorado,
En Banc.

July 6, 1993.

As Modified on Denial of Rehearing
July 26, 1993.

Saunders, Snyder, Ross & Dickson, P.C., William J. Kirven, III, David C. Hallford, Deborah L. Freeman, Denver, Robert J. Flynn, Englewood, for applicant and defendant-appellant/cross-appellee.

Moses, Wittemyer, Harrison & Woodruff, P.C., Charles N. Woodruff, Veronica A. Sperling, Boulder, for objectors and plaintiffs-appellees/cross-appellants.

Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Peter A. Fahmy, Asst. Atty. Gen., Denver, for appellees.

Justice ERICKSON delivered the Opinion of the Court.

The appellant, Willows Water District (Willows), appeals from an order of the District Court, Water Division 1 (water court). The water court made a final determination of the water rights of Willows in each of the eight Phipps–Arapahoe wells (the PA wells) that are identified in letter agreements and prior applications for permits. The PA wells withdraw nontributary ground water underlying the Highlands Ranch property owned by Mission Viejo Company (Mission Viejo), and affect the water rights of Mission Viejo, Highlands Ranch Development Corporation, and Centennial Water and Sanitation District (collectively referred to as the "Highlands Ranch group").[1] In addition to the final

---

1. The brief of the Highlands Ranch group states that Mission Viejo acquired Highlands Ranch in 1979, together with the rights to ground water underlying it, except for the water produced by the wells owned by Willows. Mission Viejo purchased Highlands Ranch to develop a planned community with a projected population of 90,000 to 100,000 people. Highlands Ranch Development Corporation is a wholly owned subsidiary of Mission Viejo. These two corporations own decreed and undecreed rights to ground water underlying Highlands Ranch. Centennial owns wells located on Highlands Ranch and decreed rights to ground water underlying Highlands Ranch. Centennial utilizes

decree[2] determining the amount of water that Willows may withdraw from each of the eight PA wells, the water court found that Willows was entitled to permits to construct "additional wells" to access its finally decreed water rights, but any additional wells would be subject to the terms and conditions imposed in the decree.

We hold that the water court properly resolved the question of the amount of water that Willows may withdraw from the PA wells. We also conclude that the water court properly placed terms and conditions on Willows's ability to obtain permits for additional wells in order to preserve the contractual relationship of the parties to the extent possible and to prevent enlargement of Willows's water rights to the detriment of the water rights of the Highlands Ranch group. Accordingly, we affirm the orders of the water court.

I

The State Engineer has issued permits to Willows for the eight PA wells drawing water from an aquifer, commonly referred to as the Arapahoe formation, which under-

lies Highlands Ranch.[3] Highlands Ranch is located in Douglas County and was owned at one time by Lawrence C. Phipps, Jr. and the Estate of Lawrence C. Phipps, Jr. ("Phipps"). The rights of Willows to withdraw the ground water from the Arapahoe formation are contractually based on a complex series of transactions.[4]

The basic documents evidencing Phipps's consent allowing Willows to construct the eight PA wells are two letter agreements. Under the first letter agreement, Phipps granted permission to the Crow Western Corporation to construct two wells, wells PA1 and PA2, and to use seventy-five percent of the ground water produced therefrom. In return, Phipps retained the right to receive the remaining twenty-five percent of the water produced by the two PA wells.[5] A similar letter agreement was entered into between Phipps and the Phipps 1527 Company with respect to wells PA5 to PA8.[6] By a series of intermediate transfers, Willows obtained all of the interests of the developers of the eight PA wells. Willows also subsequently acquired the twenty-five percent interest which

the water withdrawn from its wells to supply water to the Highlands Ranch community.

**2.** The water court used the term "final decree" rather than "absolute decree" to describe the decrees for nontributary ground water wells to avoid implications that the term absolute decree has acquired in tributary water proceedings. We employ the same terminology for clarity and also refer to the rights decreed as final rights.

**3.** The Arapahoe formation in this area contains nontributary ground water outside the boundary of any designated ground-water basin. *See* § 37–90–137, 15 C.R.S. (1990 & 1992 Supp.).

**4.** While the eight PA wells permitted to and constructed by Willows are situated on Highlands Ranch, Willows has obtained no ownership interest in the overlying land. Willows utilizes the water withdrawn from the wells in addition to its other water sources to provide municipal water service to approximately 20,000 people.

**5.** The letter agreement provides in pertinent part:

Attached hereto are well sites described as Phipps No. –1 and Phipps No. –2. Applications for such wells have been, or will be filed. If permits for such wells are granted,

Crow Western will cause such wells to be installed in accordance with such permits at no cost or expense to Phipps.

It is also our understanding that water obtained from said wells shall be divided in the following manner: Seventy-five (75%) percent of the water obtained from such wells shall be used as determined by Crow Western; twenty-five (25%) percent of the water obtained from such wells shall be used as determined by Phipps.

The letter agreement does not mention wells PA3 and PA4, and the record contains no operative documents evidencing the scope of consent by Phipps with respect to wells PA3 and PA4. An affidavit, however, executed by a general partner in one of Phipps's partnerships, states that Phipps also consented to the permit applications for those two PA wells.

**6.** The second letter agreement provides:

This memo agreement is to set forth our understanding concerning water development on and around Highlands Ranch. We are filing for well permits on the Highlands Ranch which shall be named Phipps Arapahoe 5, 6, and 7 and we might file for one or two more. If such permits are granted, we will cause such wells to be installed in accordance with said permits at no cost or expense to Highlands Ranch.

Phipps had retained under the two letter agreements from Mission Viejo, who in turn had acquired the twenty-five percent interests when it purchased Highlands Ranch from Phipps.[7]

Willows subsequently sought and obtained judicial decrees adjudicating final water rights to three of the eight PA wells; and a combination of final and conditional rights to the other five.[8] Willows also obtained final decrees for all eight PA wells allowing each well to withdraw a set amount of water annually from the Arapahoe formation.[9]

To address problems it anticipated with the withdrawal of water from the eight PA wells, Willows applied to the State Engineer in 1988 for permits to construct additional wells on Highlands Ranch to supplement the original eight PA wells.[10] Willows sought permits to construct additional wells that would enable Willows to produce water from the Arapahoe formation at an increased rate, but would not increase the total annual production beyond the amounts specified in the original permits and decrees.[11]

In response, the Highlands Ranch group initiated a declaratory judgment action in the water court, case number 88CW079, seeking a determination that Willows had no right to construct the additional wells without Mission Viejo's consent. The Highlands Ranch group also sought an injunction to prevent Willows from constructing any additional wells.

In a separate proceeding, Willows and the State Engineer asked the water court to invoke its retained jurisdiction in the actions in which Willows had obtained decrees for the eight PA wells, case numbers W–8284–76 and W–9310–78, to determine whether Willows was entitled to the additional wells. The water court granted the motion to invoke its retained jurisdiction.

Case numbers 85CW163 and 85CW170 in which Willows sought final decrees for water rights previously adjudicated condition-

---

7. When Mission Viejo transferred its rights under the two letter agreements to Willows, a question arose as to the right of Willows to construct additional wells on Highlands Ranch. The transfer instruments specifically reserve as unresolved the issue of whether Willows can obtain permits for additional wells to produce the nontributary ground water that is authorized under its permits and decrees. A like reservation was stipulated to by Mission Viejo and Willows and included in the two previous decrees Willows obtained for the eight PA wells.

8. The decree entered by the water court in case number W–8284–76 covers wells PA1, PA2, PA3, and PA4. Wells PA1, PA2, and PA3 were each granted final rights for 480 acre feet per year, and well PA4 was granted final rights to 320 acre feet per year and conditional rights to 160 acre feet per year. The decree entered by the water court in case number W–9310–78 covers wells PA5, PA6, PA7, and PA8, and granted final rights based on the amount of water each well had actually produced, and conditional rights based on the maximum annual appropriation for each PA well less the final rights.

9. The finally decreed amounts for each well were determined in case numbers W–8284–76 (wells PA1, PA2, and PA3) and the case presently before this court (wells PA4, PA5, PA6, PA7, and PA8). The finally decreed amounts are as follows:

PA1: 480 acre feet per year absolute, maximum withdrawal rate of 590 gallons per minute.

PA2: 480 acre feet per year absolute, maximum withdrawal rate of 600 gallons per minute.

PA3: 480 acre feet per year absolute, maximum withdrawal rate of 600 gallons per minute.

PA4: 480 acre feet per year absolute, maximum withdrawal rate of 500 gallons per minute.

PA5: 105 acre feet per year absolute, maximum withdrawal rate of 250 gallons per minute.

PA6: 480 acre feet per year absolute, maximum withdrawal rate of 600 gallons per minute.

PA7: 480 acre feet per year absolute, maximum withdrawal rate of 600 gallons per minute.

PA8: 480 acre feet per year absolute, maximum withdrawal rate of 600 gallons per minute.

10. Because the water is nontributary, it is not subject to annual recharge. Therefore, production of water from the Arapahoe formation over time will lower the water level and diminish the hydrostatic pressure, thereby decreasing the capability of the eight PA wells to produce their decreed amounts of water. Additionally, rate of flow limitations encompassed in the permits issued for the eight PA wells and in the prior decrees granting both absolute and conditional water rights precluded production of water from the wells at a rate adequate to meet the peak seasonal demands of Willows's customers.

11. Willows sought permits for eight additional wells to pump water at the rate of 1500 gallons per minute, subject only to its finally decreed annual appropriation of 3,465 total acre feet.

ally to five of the original eight PA wells were also simultaneously pending in the water court.[12] In June 1989, the water court consolidated all of the foregoing cases for trial.

The water court heard the consolidated cases between August 29, 1989, and September 7, 1989. On April 3, 1990, the court issued a memorandum of decision and order for the consolidated cases. The court's findings and conclusions related almost entirely to the legal requirements for obtaining a final decree for the conditional water rights and the quantification of such rights in a final decree in case numbers 85CW163 and 85CW170. The water court ordered Willows to submit a proposed final decree with respect to three of the five PA wells for which a final decree had not been obtained earlier and directed a further hearing to address an unresolved issue as to the final decree for the other two PA wells. The Highlands Ranch group sought review before this court of the water court's determination concerning Willows's right to permits for additional wells by taking separate appeals from one of the retained jurisdiction actions, case number W–8284–76, and the declaratory and injunctive action, case number 88CW079.[13]

On appeal, we decided that the water court had not finally determined all of the issues contained in the consolidated cases, and had not specifically determined, pursuant to C.R.C.P. 54(b), that there was no just reason for delaying an appeal by the Highlands Ranch group. We therefore dismissed both appeals because we lacked jurisdiction to consider the merits of the water court's order on the additional wells issue. *Mission Viejo Co. v. Willows Conservation Dist.*, 818 P.2d 254, 262 (Colo.1991).

On remand, the water court issued its amended findings of fact, conclusions of law, judgment and decree concluding that (1) the conditional decrees issued for Willows's PA wells were to be made final based on the amount of water each PA well is reasonably able to produce; (2) Willows could obtain permits to construct replacement or substitute wells and supplemental wells as necessary to allow it to continue to secure the decreed amounts of water; (3) any application for an additional well permit would be subject to specified terms and conditions related to the current ability of each PA well to withdraw its finally decreed amounts, and on the locations, spacing, and pumping capacity of any additional wells that Willows may seek to place on Highlands Ranch; and (4) the provisions of the existing decrees would continue to be enforced except for the actual production and diligence requirements.

In the present appeal, Willows contends that the water court erred in making the factual determination that the Highlands Ranch group did not consent to Willows obtaining the unrestricted entitlement to permits for the construction of additional wells, including such supplemental wells as may be necessary to obtain the total quantity of water decreed to the original eight PA wells and authorized by the original PA well permits. As an alternative ground to support its unrestricted right to additional well permits, Willows asserts that the enactment of section 37–90–137(10), 15 C.R.S. (1990), which provides that owners of permits issued pursuant to section 37–90–137(4) "shall be entitled to the issuance of permits for additional wells," mandates the issuance of additional well permits regard-

---

12. Wells PA1, PA2, and PA3 had been granted final rights to nontributary ground water on June 25, 1981, in case number W–8284–76. Wells PA4, PA5, PA6, PA7, and PA8 had each been granted absolute and conditional rights to nontributary ground water in case number W–8284–76, entered on June 25, 1981 (PA4), and W–9310–78 entered on October 1, 1984 (PA5–PA8). In case numbers 85CW163 and 85CW170 Willows was seeking final rights in wells PA5 through PA8.

13. In its April 3, 1990, memorandum of decision and order, the water court resolved the additional wells issue by stating:

After having secured a final decree—or, as formerly, an absolute decree—replacement or additional wells may be permitted where necessary to allow the decree holder to continue *to secure the decreed amounts of water. The* rights to replacement or additional wells may be limited in this case by the question of whether Willows has access to land to place them on. That issue is not involved in the present case.

less of whether Mission Viejo has previously consented to the construction of such wells.

The Highlands Ranch group, however, claims that the original letter agreements giving landowner consent to the construction of the eight PA wells must be construed as limiting that consent to eight, and only eight, wells. Therefore, the Highlands Ranch group contends that Willows obtained no landowner consent for any additional wells under the letter agreements and none of the intermediate transfers expanded the scope of the original consent.

The water court rejected all of the alternative positions offered by the parties, and adopted instead an interpretation of the contractual agreements and relevant statutes allowing Willows to obtain permits to construct additional wells. Under the water court's interpretation, the permits issued to Willows are subject to the consent of the overlying landowner who may contractually limit the non-landowner's ability to obtain additional well permits. Accordingly, the water court determined that it may properly condition the issuance of the additional well permits in this case to preserve the contractual relationship of the parties to the extent possible and to prevent enlargement of the water rights decreed to Willows to the detriment of the vested water rights of the Highlands Ranch group.

The water court's interpretation of the relevant statutes, rules and regulations, and case law recognizes that while an overlying landowner may have consented to the *water production* of the wells originally permitted for the property, the landowner may not have consented to the unlimited placement of wells on his property for the withdrawal of the full amount of water finally decreed by a water court. In reaching its conclusion that Willows may receive additional well permits, subject to certain terms and conditions, the water court made factual findings and conclusions of law. Based on the record before us, we conclude that the water court did not err and affirm its factual findings and legal conclusions.

## II

■ Factual findings of the water court that are supported by competent evidence in the record will not be disturbed on appeal even though the appellate court might have reached a different conclusion. *Peterson v. Ground Water Comm'n*, 195 Colo. 508, 516, 579 P.2d 629, 634 (1978). The sufficiency, probative effect, and weight of the evidence before the water court, together with the inferences and conclusions to be drawn therefrom, will not be disturbed unless they are so clearly erroneous as to find no support in the record. *Id.* at 516, 579 P.2d at 634–35.

■ In this case, the water court correctly determined that the letter agreements were ambiguous as to the extent of consent given to Willows for the withdrawal of nontributary ground water from beneath the property owned by Mission Viejo predecessors in interest.[14] It is impossible to tell from the documents themselves whether Mission Viejo consented only to the eight original PA wells, and no more, or whether it consented to as many wells as are necessary to remove the total decreed amounts of water without limitations being placed on the number of wells to be constructed. Accordingly, parol evidence was both necessary and admissible to ascertain the intent of the original parties to the letter agreements. *See Hammond v. Caton*, 121 Colo. 7, 12, 212 P.2d 845, 847 (1949) (stating that where ambiguity admittedly exists in the language of the contract, the intent of the parties should govern and that any

---

14. The requirement of landowner consent for drilling wells on lands owned by another is derived from statute. At the time the well permits for the eight PA wells were applied for and granted, the governing statute, which is commonly referred to as "Senate Bill 213," was 1963 C.R.S. § 148–18–36, adopted by ch. 441, sec. 1, § 148–18–36, 1973 Colo.Sess.Laws 520. The parties agree that Senate Bill 213 required the consent of the owner of the land on which a well was to be drilled as a condition to the issuance of a permit by the State Engineer to construct a well to withdraw nontributary water outside the boundaries of a designated groundwater basin. The statute was amended by legislation commonly referred to as "Senate Bill 5," making the consent requirement more explicit. *See* § 37–90–137(4)(b)(II), 15 C.R.S. (1990).

evidence showing such intent is highly important); *Chambliss/Jenkins Assocs. v. Forster*, 650 P.2d 1315, 1318 (Colo.App. 1982) (stating that written documents containing ambiguities or unclear language must be construed in accordance with the intent of the parties, and relevant extraneous evidence may be considered to resolve the factual question of the parties intent).

In this case, the water court conducted hearings and received evidence on eight separate occasions. Based on the evidence before it, the water court determined that the letter agreements constituted a *conveyance of the production* from each of the eight original PA wells.[15] The water court also found that the letter agreements did not establish that the Highlands Ranch group ever consented to the removal of·the *total* amount of water that was decreed by the water court regardless of how many or what type of wells were necessary or desirable to withdraw the decreed amounts. Nor do the letter agreements consent only to Willows's withdrawal of the amount of water actually withdrawn by the original eight PA wells as claimed by the Highlands

Ranch group. In our view, the water court's factual determinations that (1) the letter agreements limited the consent given Willows to a conveyance of the production of the original eight PA wells; (2) Willows was entitled to construct additional wells, including "supplemental wells," as necessary to obtain the amount of water finally decreed to each PA well; and (3) terms and conditions relating to the permitting, construction, and operation of the additional wells are necessary to preserve the·contractual relationship of the parties; are based on sufficient competent testimonial and documentary evidence. Accordingly, we will not disturb the factual findings on appeal.[16]

### III

Based on its findings that Mission Viejo had consented to the construction of eight wells for the withdrawal of nontributary ground water from the Arapahoe formation beneath its land, and that the contractual agreements of the parties constituted a conveyance of the production of the water obtained from the wells, the water

**15.** Among other things, the trial court found that:

> Willows is not the owner of Highlands Ranch and therefore does not own the land overlying the ground water that is withdrawn by the PA wells or that would be withdrawn by replacement or substitute wells or supplemental wells for the PA wells. The primary documents evidencing the consent of the owners of Highlands Ranch to the withdrawal of ground water underlying Highlands Ranch by Willows are the original letter agreements authorizing construction of the·PA wells.
>
> . . . .
>
> Examination of the documents upon which Willows' claim for water on the Highlands Ranch property is based convinces the court that the parties to the original agreements contemplated only the conveyance [of] the production of the wells, and not an interest in the Highlands Ranch property itself. The original documents authorizing those wells were in letter form and were somewhat informal, but the foregoing interpretation seems unmistakable. The subsequent more formal instruments seem only intended to preserve the status quo as far as the issues of this case are concerned.
>
> . . . .
>
> Utilization of nontributary ground water requires a reasonable method of capturing that

water.·The agreements of the parties necessarily imply the right to construct replacement or substitute wells and supplemental wells as necessary to obtain that production and evidence the implied consent of the owners of Highlands Ranch to such replacement or substitute wells and supplemental wells. No express consent has been given, nor is it necessary.

> . . . .
>
> Based upon the evidence presented herein, the Court finds that the terms and conditions set forth hereinafter on the construction and operation of replacement or substitute wells and supplemental wells on Highlands Ranch for the PA wells are necessary to preserve the contractual relationship of the parties to the extent possible, and to prevent enlargement of Willows' water rights to the injury of [the Highlands Ranch group's] water rights.

**16.** The amounts that each PA well is reasonably able to produce has also been finally determined by the water court. Willows is permitted to withdraw the individual amounts from the individual PA wells or the individual amounts from additional wells, and the water court has retained authority to determine when those additional wells will be permitted, where they will be placed on Highlands Ranch, and the pumping rates at which they may withdraw the nontributary ground water.

court found Willows had an implied right to the permitting and construction of replacement or substitute wells and supplemental wells as necessary to obtain that production. The water court subsequently concluded that the imposition of terms and conditions on the permitting and construction of replacement or substitute and supplemental wells "to prevent increased interference between the parties' wells is not prohibited by current statutes, rules, regulations or case law governing the use of nontributary ground water." [17]

■ Section 37–90–137(10) provides that "[o]wners of such permits issued pursuant to [37–90–137(4)] shall be entitled to the issuance of permits for *additional wells* to be constructed on the land referred to in [37–90–137(4)]" (emphasis added).[18] The dispute between the parties, and the issue before us, is whether Willows is entitled to well permits for the construction of a type of additional well which is statutorily defined in section 37–90–103(17) as a "supplemental well"[19] without restrictions being imposed by the water court on the permitting and construction of those wells.[20]

Section 37–90–137(10) entitles the holder of previously issued well permits to the issuance of additional well permits to withdraw nontributary ground water from an aquifer beneath the overlying land. In the case of permits previously issued to a nonlandowner based on the consent of an over-

17. The water court made the following conclusions of law based on its analysis of the relevant statutes, rules, regulations, and case law:

Willows' right to supplemental wells is based on contract and not on § 37–90–137(10), C.R.S. No overlying land area on Highlands Ranch has been assigned to Willows for purposes of ground water production. The contractual relationship of the parties, should be adhered to as much as possible given current requirements of public policy. The right to a supplemental well is contingent on a showing that the present well cannot produce its decreed annual amount. Conditions should be imposed to prevent enlargement of the decreed water rights for Willows' wells and to prevent replacement or substitute wells or supplemental wells from having a greater effect on [the Highlands Ranch group's] Arapahoe formation wells than the effect of the existing PA wells, to the extent possible.

18. While there is no statutory definition of the term "additional well" as it is used in section 37–90–137(10), the water court broadly defined the term as *any* well other than the originally decreed well, including a supplemental well as defined in section 37–90–103(17), 15 C.R.S. (1992 Supp.), and a replacement or substitute well as defined in section 37–90–103(13), 15 C.R.S. (1990). We agree with, and now adopt the water court's definition of the term "additional well." Cf. *Mission Viejo Co. v. Willows Conservation Dist.*, 818 P.2d 254, 256 n. 4 (Colo. 1991) ("We use the term, 'additional wells' to include both replacement or substitute wells, and supplemental wells.") (citations omitted).

Willows construes the term "additional well" more narrowly, suggesting that the proper definition of the term is found in Rule 4.A.(1) of the Statewide Nontributary Ground Water Rules, 2 C.C.R. 402–7 (1986), which defines "additional well" as:

a well permitted pursuant to Section 37–90–137(10), C.R.S. *An additional well, together with previously permitted or decreed wells* withdrawing water as described in Section 37–90–137(4), C.R.S., may withdraw the allowed average annual amount of withdrawal of the previously permitted or decreed wells. *Id.* (emphasis added).

We disagree. The Rule 4.A.(1) definition is actually more comparable to the term "supplemental well" as that term is defined in section 37–90–103(17).

19. Section 37–90–103(17) defines "supplemental well" as "any well drilled and used, in *addition to an original well* or other diversion, for the purpose of obtaining the quantity of the original appropriation of the original well, which quantity can no longer be obtained from the original well." (Emphasis added.)

20. The parties do not seriously dispute the water court's determination that Willows is entitled to permits for the type of additional well which is statutorily defined in section 37–90–103(13) as "replacement or substitute wells." Section 37–90–103(13) defines "replacement or substitute well" as "a new well which *replaces an existing well,* and which shall be limited to the *yield of the original well* and shall take the date of priority of the original well, which shall be abandoned upon completion of the new well." Because the water court found that Mission Viejo had contractually consented to the production of nontributary ground water underneath Highlands Ranch and that this consent implied a right by the non-landowner to obtain permits for "replacement or substitute wells," as necessary to obtain the agreed production of nontributary ground water, we express no opinion on whether a landowner may also contractually prohibit a consensual purchaser of nontributary ground water from obtaining permits for replacement or substitute wells.

lying landowner, an application for an additional well permit requires review of the conditions under which the landowner originally consented to the removal of the nontributary ground water beneath his land. The Statewide Nontributary Ground Water Rules, 2 C.C.R. 402–7 (1986), require an applicant for an additional well permit to provide the State Engineer with substantially the same information as is required in an application for the original well permit. *See* Rule 12.A(2), Statewide Nontributary Ground Water Rules, 2 C.C.R. 402–7 (1986). The purpose of this requirement is to satisfy sections 37–90–137(1), (2) and (4) which, when read together, provide the circumstances under which a well applicant may obtain a permit to construct a well on land he does not own.

In reviewing a permit application to construct wells on land not owned by the applicant, the contractual arrangement of the applicant and the overlying landowner defines the ability of the applicant to obtain the permit. Pursuant to section 37–90–137(4), the State Engineer or the water court is obligated to determine whether the landowner has contractually limited the consent he has provided the applicant to construct wells on the overlying land. The State Engineer or the water court is also obligated, pursuant to section 37–90–137(2), to determine whether the construction of the well will materially injure the vested water rights of others. The statutory scheme provided in section 37–90–137 thus ensures that the consensual contractual arrangements of parties desiring to allocate

nontributary ground water rights among themselves are given effect.[21]

Section 37–90–137 coupled with the filing requirements of the Statewide Nontributary Ground Water Rules provide the necessary legal framework and justification for the placement of terms and conditions on the ability of Willows to obtain permits for the construction of additional wells on property that is owned exclusively by Mission Viejo. Where parties initially limit the statutorily required consent, the State Engineer or the water court on review of an application for an additional well permit must consider the nature and extent of the initial consent, along with the impact on the vested water rights of others in determining whether additional wells may be permitted. Accordingly, the water court's conclusion that it may place terms and conditions on the issuance of additional well permits in this case is correct.

### IV

■ Willows and the Highlands Ranch group each appeal the water court's determination of the final rights of Willows in five of the eight PA wells.[22] Willows claims that the water court erred in determining the final rights of well PA5 because the water court arrived at the final rights determination by considering the amount of water the well was actually able to produce rather than the amount of water available within a "cylinder of appropriation" for the well that was used by the water court as a basis for analysis in a separate decree.[23] The Highlands Ranch

**21.** We have previously recognized the ability of owners of land on which nontributary water exists to contractually allocate those rights between themselves and others. *See Perdue v. Ft. Lyon Canal Co.*, 184 Colo. 219, 519 P.2d 954 (1974) (upholding water court judgment granting a conditional decree for nontributary water and determining that, by reason of a private agreement between the parties, the later decree was superior to an earlier decree awarded to other claimants); *cf. Denver v. Fulton Irrigating Ditch Co.*, 179 Colo. 47, 506 P.2d 144 (1972) (holding that water rights available under a decree entered by a water court may be limited by private agreement entered into by that party).

**22.** *See supra* nn. 8–9.

**23.** The term "cylinder of appropriation" was used by the water court in case number W–9192–78 which adjudicated the Highlands Ranch group's water rights in a well field the Highlands Ranch group was seeking to place on Highlands Ranch. In case number W–9192–78, the water court used the concept of cylinders of appropriation to determine the amount of water available for the Highlands Ranch group's well field as well as for spacing purposes to minimize well-to-well interference and to distribute pumping effects as evenly as possible throughout the Arapahoe formation. In the present case, the water court made the factual determination that "no overlying land area on Highlands Ranch has been assigned to Willows for purposes of ground water production." Implicit

group claims the water court erred in decreeing the final rights to all of the PA wells based on the amount of water each well is able to produce rather than on the amount actually diverted during a calendar year.

## A

Willows contends that the water court erred in finally decreeing only 105 acre feet annually to well PA5. The water court rejected Willows's assertion that it was entitled to a final decree for the full amount of water (320 acre feet annually) that was conditionally decreed to well PA5 and is undisputably contained in the well's cylinder of appropriation. We agree with the water court.

Willows is not the owner of Highlands Ranch and therefore does not own the land overlying the ground water that is withdrawn by the PA wells. Instead, the parties' agreements constituted a conveyance of the production of the eight original PA wells. The water court determined that the agreements between the parties limited the amount of water finally decreed to each of the eight PA wells to the amount of water that any individual well is actually able to produce.[24]

It is undisputed that well PA5 cannot, and never could, produce more than 105 acre feet of water per year. The fact that the well is incapable of producing the entire amount of conditionally decreed water does not mandate the conclusion that Willows is entitled to construct additional wells within the area of the cylinder of appropriation for purposes of obtaining more water than the original PA well could

actually produce. In our view, the water court correctly concluded that Willows is only entitled to a final decree for well PA5 in the amount of 105 acre feet annually instead of 320 acre feet annually.

## B

In deciding the amount of nontributary ground water that should be finally decreed to each of the eight PA wells, the water court determined that Willows's final rights are to be based on the actual capabilities of each individual PA well rather than on a provision contained in previous decrees providing for the determination of finally decreed amounts based on the actual diversion and use of the water during any calendar year.[25] The water court determined that the actual production requirements of the stipulated provisions violate the public policy of seeking to prevent the waste of precious and nonrenewable nontributary aquifers.

On appeal, it is not disputed that the General Assembly has instituted an administrative and regulatory procedure establishing a public policy of seeking to prevent the waste of a precious nonrenewable natural resource. The contractual provisions the parties incorporated into the prior decrees are therefore void and unenforceable if they are contrary to that stated public policy. *F.D.I.C. v. American Casualty Co.*, 843 P.2d 1285, 1290 (Colo.1992); *University of Denver v. Indus. Comm'n of Colo.*, 138 Colo. 505, 509 335 P.2d 292, 294 (1959). The Highlands Ranch group asserts that the water court erred in determining that the public policy against waste

in this factual determination is the conclusion that the water court's prior use of cylinders of appropriation in case W–9192–78 did not grant to Willows the right to withdraw water from the cylinder area instead of the individual wells. The record supports the water court's factual determinations and they will not be overturned on appeal. *See supra* section II.

24. The water court said that "Willows is entitled to [final] decrees for [wells PA4 through PA8], but the quantities which are to be decreed are those which the wells are reasonably able to

produce, not the maximum quantity provided for in the original contract."

25. The decrees which were entered determining Willows's conditional and final rights in the eight PA wells, case numbers W–8284–76 and W–9310–78, contain negotiated stipulations providing that the amount of water finally decreed by the water court to each of the wells shall be determined based on the amount of water that was actually diverted by the PA well and applied to beneficial use in any calendar year.

was violated in this case.[26] The record contains sufficient evidentiary support for the water court's factual determination that enforcement of the actual production requirements in this case violates public policy. *See Peterson*, 195 Colo. at 514–16, 579 P.2d at 634 (factual findings of a water court will not be disturbed on appeal if they are supported by competent evidence in the record).[27] We therefore affirm the water court's final decree providing for Willows's right to withdraw nontributary ground water up to the amounts the original eight PA wells are able to produce instead of the amounts they have actually produced in any calendar year to date.

V

We agree with the water court's determination of the final amount of water that Willows may withdraw from each of the eight PA wells and that Willows is entitled to permits for the construction of additional wells on Highlands Ranch as may become necessary to fully utilize its decreed final rights. We also conclude that the water court properly placed terms and conditions on Willows's ability to obtain permits for additional wells in order to preserve the contractual relationship of the parties to the extent possible and to prevent enlargement of Willows's water rights to the detriment of the water rights of the Highlands Ranch group. Accordingly, we

26. In support of their assertion, the Highlands Ranch group provides a possible factual scenario under which Willows could have withdrawn the entire amount of conditionally decreed water from each of its PA wells. We are not convinced that the assertion of a possible factual scenario showing that a well owner may potentially satisfy actual production requirements without wasting ground water detracts from the water court's factual determination that the actual production requirements encourage the waste of ground water and are thus violative of public policy. In our view, it is more likely that a well owner faced with actual production requirements to obtain final rights to nontributary ground water will not seek the least wasteful practice of meeting those requirements. Among the public policies supporting the regulation of nontributary ground water is the *prevention of practices* that waste this precious and nonrenewable natural resource, not simply the *discouragement of such practices*.

affirm the orders entered by the water court.

27. The trial court stated that:

Application of [actual production requirements] might well lead to the sort of waste that C.R.S. § 37–92–305(11) was enacted to prevent, and which is now contrary to the public policy of this state.

. . . .

There can be no doubt that the original agreement of the parties and the decrees of this court contemplated actual production as the measure of the water right. It should not now, however, be necessary that the wells in question be made actually to produce those quantities before a final decree may enter. Satisfactory evidence that the well is able to produce the amount is sufficient. Such a result will preserve the original expectations of the parties, yet not contravene the present public policy of the state requiring prevention of waste of this valuable resource.