**BAYOU LAND COMPANY, a Colorado limited partnership, Petitioner,**

**v.**

**Barry L. TALLEY; Barry Talley, Trustee, a Colorado general partnership; American Property Equities 1985–C, Ltd., a Colorado limited partnership; Bayou Gulch General Partnership, a Colorado general partnership; Megabank of Arapahoe, N.A., a federally chartered bank; and Marilyn Green, in her capacity as the Public Trustee for Douglas County, Colorado, Respondents.**

**No. 95SC358.**

Supreme Court of Colorado, En Banc.

Sept. 23, 1996.

**■■■■■**

---

140

Clayton and Stone, L.L.C., F. Brittin Clayton, III, Boulder, Bearman, Talesnick & Clowdus, P.C., W. Michael Clowdus, Denver, for Petitioner.

Nichols & Hecht, LLC, Charles B. Hecht, Denver, Holly I. Holder, P.C., Holly I. Holder, Denver, for Barry L. Talley; Barry Talley, Trustee; and Bayou Gulch General Partnership.

Justice KOURLIS delivered the Opinion of the Court.

In this case we granted petitions for certiorari prior to judgment by the court of appeals primarily to determine the nature of an overlying landowner's interest in unadjudicated nontributary ground water. We now conclude that landowners do have a right to withdraw nontributary ground water underlying their land even in the absence of formal water court adjudication. This right is defined by statute and is presumed to be con-

veyed by a deed for the land unless excepted from that deed by express reservation.

This case concerns a series of land transactions involving the plaintiff, Bayou Land Company (BLC), and the defendants, Barry L. Talley; Barry Talley, Trustee, a general partnership (Talley Partnership);[1] American Property Equities 1985–C, Ltd. (APE); Bayou Gulch, a Colorado General Partnership (Bayou Gulch); and Megabank of Arapahoe, N.A.[2] BLC held a deed of trust encumbering land purchased by the defendants through a series of intermediary owners. BLC foreclosed on the property and brought the present lawsuit to determine whether the nontributary ground water under the land was included in the foreclosure, as well as to determine the relative recourse liabilities of the defendants under the promissory note secured by the deed of trust. Bayou Gulch counterclaimed to quiet title to the nontributary ground water. In addition, Bayou Gulch along with the Talley Partnership counterclaimed that BLC had breached the implied covenant of good faith and fair dealing by bringing suit against them. On summary judgment, the district court found that neither Bayou Gulch nor APE had any recourse liability under the promissory note secured by the deed of trust. The court also dismissed the bad faith and quiet title claims of Bayou Gulch and the Talley Partnership. After trial, the court found that the nontributary ground water rights were not encumbered by the deed of trust and thus were not subject to foreclosure, based upon the conclusion that a landowner does not have any rights to nontributary ground water prior to water court adjudication of those rights. The court also found that the Talley Partnership owned ninety percent of the nontributary ground water rights as a result of a water court decree and that BLC acquired the remaining ten percent in settlement negotiations with a former party to this lawsuit who received those rights through the same water court decree. Finally, the district court found that the Talley Partnership was not personally liable under the note. BLC

appealed the district court's rulings to the court of appeals and Bayou Gulch cross-appealed. Prior to the court of appeals rendering judgment, BLC petitioned for certiorari and Bayou Gulch cross-petitioned for certiorari pursuant to C.A.R. 50.

We granted the petitions for certiorari prior to judgment by the court of appeals to consider (1) whether a deed of trust may encumber unadjudicated nontributary ground water which is not part of a designated basin; (2) who owns the rights to the nontributary ground water at issue; (3) whether the district court erred in granting summary judgment as to the recourse liability of defendants, Bayou Gulch and APE, under the deed of trust; and (4) whether the district court erred in dismissing the counterclaims of Bayou Gulch and the Talley Partnership regarding BLC's alleged bad faith. We reverse the district court's ruling regarding issues one and two and remand for further proceedings consistent with this opinion. We also reverse the district court's grant of summary judgment for Bayou Gulch regarding issue three. We affirm the district court's resolution of issue four.

## I.

On January 23, 1984, BLC sold Dr. Ralph Warren 932 acres of property in Douglas County. The deed to this property expressly included three irrigation wells, and "[a]ny and all water or water rights, ditch or ditch rights, reservoir or reservoir and storage rights appertaining to the property." At the time of this transfer, BLC had conducted two water studies and was aware that a substantial amount of nontributary ground water existed beneath the property. In consideration for the land transfer, Warren paid BLC some cash and executed a promissory note for $953,100.

The promissory note contained a recourse provision subjecting Warren to recourse liability for any principal balance plus accrued interest exceeding $853,100. Since the total

---

1. Barry Talley, Trustee is a general partnership. The term "trustee" does not relate to a trust.

2. Bayou Land Company also named Marilyn Green, in her capacity as Public Trustee of Douglas County, Colorado, as a defendant although she was not involved in the land transactions.

debt amounted to $953,100, Warren's recourse liability amounted to $100,000. The note expressly released the maker and any and all successors in interest from personal liability up to $853,100.

Warren secured the promissory note with a deed of trust encumbering 572 of the 932 acres of the property.[3] The deed of trust did not include any specific reference to "water rights"; however, Warren testified at the trial on this matter that he assumed the deed of trust covered everything he had received from BLC in the transfer of the 572 acres.

In February 1984, Warren sold the 572 acres encumbered by the deed of trust to Albert and Fred Blum (collectively, "the Blums").[4] The deed conveying the property to the Blums included "[a]ll water and ditch rights appurtenant to that real property . . . ." As part of the agreement, the Blums assumed the $953,100 note held by BLC. The Blums further agreed to indemnify and hold Warren harmless from any personal liability under the BLC note up to $100,000 plus interest, at the rate of twelve percent per annum from the date of default, plus costs and attorney's fees.

The Blums then entered into a series of three transactions with the Talley Partnership, in which they cumulatively conveyed eighty percent of their interest in the property.[5] In the first transaction the Blums transferred fifteen percent of their interest in the land by special warranty deed on February 10, 1984. The deed did not refer to "water rights." In addition, the Blums entered into a cotenancy agreement with the Talley Partnership. The Talley Partnership contributed cash for a down payment and closing costs on the property. The Blums agreed to assume all liability on two promissory notes, including the Warren note, secured by the proper-

ty. In addition, the agreement provided that all other costs on the property would be divided according to each party's ownership interest.

On September 13, 1984, the Blums transferred an additional thirty percent interest in the property to the Talley Partnership by special warranty deed. Again, the deed did not specifically refer to "water rights." The Talley Partnership and the Blums amended the cotenancy agreement to provide that: "[The] Talley [Partnership] shall assume liability on $391,000 of that 1st trust deed indebtedness of $953,100 for the use and benefit of Bayou [L]and Company. Blum shall continue liability on the remaining $562,100 of indebtedness." Thus, the new cotenancy agreement altered the Blums' and Talley Partnership's liability for the debt payments in proportion to their respective ownership shares in the property.

In the final transaction, the Blums transferred an additional thirty-five percent interest in the property to the Talley Partnership by special warranty deed on January 15, 1985. The deed did not specifically refer to any water rights. The Talley Partnership and the Blums amended the cotenancy agreement to reflect that the Talley Partnership now owned an eighty percent share of the property. The new cotenancy agreement also provided that the Blums and the Talley Partnership would share liability on the existing combined indebtedness of $1,138,100 in accordance with their pro rata ownership interests.

On June 12, 1984, prior to the latter two land transfers to the Talley Partnership, the Blums and the Talley Partnership filed an application for conditional underground water rights from nontributary sources with the water court for water division 1 (water

---

3. The three wells expressly listed in the deed were located on the 360 acres not included in the deed of trust.

4. In addition to the 572 acres, Warren conveyed two acres that were free of all encumbrances. As these two acres are not encumbered by the deed of trust, they will not be referred to in the remainder of the opinion. However, the Blums' subsequent transfers of their property interest in the land included the unencumbered two acres.

5. In actuality, the Blums transferred their interests by warranty deed to Wood Brothers Homes, Inc., a separate entity, which immediately transferred the property to the Talley Partnership. The Blums conducted the transfers in this manner for tax purposes at the instruction of the Talley Partnership. As Wood Brothers Homes, Inc. is not a party to this suit and had no actual input into the character of the transactions at issue, we do not refer to them further.

court). On February 27, 1986, after the final two land transfers to the Talley Partnership were complete, the water court issued a water rights decree adjudicating 841 acre feet of nontributary ground water per year to the Blums and the Talley Partnership.[6]

The Blums, the Talley Partnership, and APE formed Bayou Gulch on January 1, 1986. On January 14, 1986, the Talley Partnership transferred to APE a forty percent share of the property in exchange for some cash and a note which offset payments on its remaining forty percent share under the original Warren note. APE, the Talley Partnership, and the Blums all subsequently quitclaimed their shares in the property to Bayou Gulch.[7] These deeds all referred to any and all water rights appurtenant to the land, but each transaction preceded the water court decree regarding the nontributary water underneath the property.[8] The partners agreed to make capital contributions to satisfy the debt encumbering the property in proportion to their ownership interests in the partnership.

Bayou Gulch continued to make payments on the original Warren note encumbering the property until 1989. On September 25, 1989, BLC and Bayou Gulch entered into the first of three agreements to modify the required payments under the Warren promissory note. Under the first modification agreement, Bayou Gulch agreed to pay BLC $52,-500 in lieu of the $105,003 due under the note. In essence, BLC deferred its collection of interest under the note and increased the total amount of principal ultimately due. The agreement designated BLC as "lender" and Bayou Gulch as "borrower."

On January 24, 1990, because of financial difficulties, Albert Blum quitclaimed his ten percent interest in Bayou Gulch to Talley. The transfer included "any and all rights"

Albert Blum had under the partnership agreement.

On April 4, 1990, BLC and Bayou Gulch entered into a second modification agreement. Under this agreement, Bayou Gulch agreed to pay $45,000 to satisfy payments under the note. Again BLC deferred interest payments and increased the principal amount accordingly. The third modification agreement, entered into on April 4, 1991, between BLC and Bayou Gulch was much the same as the first two. Bayou Gulch agreed to pay $46,000, and to make two additional payments of $45,000 on January 23, 1992, and January 23, 1993, respectively. BLC deferred interest payments due under the note and increased the principal balance. Both the 1990 and 1991 modifications referred to BLC as "lender" and Bayou Gulch as "borrower." Although Bayou Gulch made its initial payment under the third modification agreement, it failed to make the $45,000 payment due on January 23, 1992.

In July 1992, BLC filed the present action seeking a foreclosure on the 572 acre parcel encumbered under the Warren deed of trust and upon the decreed water rights. BLC also sought personal judgments against Warren and the Blums under the recourse provision of the note. As part of the settlement, the Blums quitclaimed all of their interests in the decreed water rights to BLC. BLC then amended its complaint to assert a quiet title claim as to the decreed water rights based on the Blums' transfer of their interest.[9] BLC also amended its complaint to assert personal liability against Bayou Gulch, APE, Talley and the Talley Partnership[10] under the recourse provision of the note. BLC alleged that Bayou Gulch and its partners had expressly assumed the recourse obligations under the note as part of their partnership

---

6. It is unclear how the Blums and the Talley Partnership intended to divide their interests in the decreed water rights.

7. APE and the Talley Partnership each had a 40% share and the Blums owned the remaining 20% share.

8. Neither the Blums nor Talley transferred any decreed water rights in the property to Bayou Gulch after the water court decree.

9. Since BLC settled with Warren and the Blums after the initiation of this lawsuit, they are no longer parties to this action.

10. BLC sought a personal judgment both against the Talley Partnership and Talley in his individual capacity.

agreement or, in the alternative, that Bayou Gulch had assumed the note when it agreed to the modifications of the note with BLC. As to the Talley Partnership, BLC claimed that the Talley Partnership assumed the note when it acquired its eighty percent interest in the property from the Blums. BLC settled with Warren and the Blums prior to filing the amended complaint.

Bayou Gulch counterclaimed seeking to quiet title to the decreed water rights, and both Bayou Gulch and the Talley Partnership filed counterclaims alleging that BLC had violated the implied covenant of good faith and fair dealing by (1) asserting a personal recourse liability claim against them; (2) asserting an exaggerated amount due under the recourse provision of the note; and (3) asserting a claim for the decreed water rights under the deed of trust.

The defendants moved for summary judgment on BLC's recourse liability claim against Bayou Gulch, APE, the Talley Partnership and Talley individually. The district court granted summary judgment in regard to Bayou Gulch and APE, but denied summary judgment as to the Talley Partnership and Talley.

The district court then held a trial to consider the remaining claims: (1) BLC's claim for foreclosure on the water rights; (2) BLC's alternative claim to quiet title to the decreed water rights; (3) BLC's personal liability claim against the Talley Partnership and Talley, under the recourse provision of the note; (4) Bayou Gulch's counterclaim to quiet title to the decreed water rights; and (5) the claims of Bayou Gulch and the Talley Partnership that BLC violated the covenant of good faith and fair dealing.

After the trial, the district court, relying on our decision in *State v. Southwestern Colorado Water Conservation District,* 671 P.2d 1294 (Colo.1983) (hereinafter *"Southwestern Colorado"*), *cert. denied,* 466 U.S. 944, 104 S.Ct. 1929, 80 L.Ed.2d 474 (1984), ruled as a

matter of law that the deed of trust securing the Warren promissory note could not have encumbered the nontributary water in the property because "[t]here were no water rights to be encumbered until those rights were decreed by the Water Court." The district court, therefore, ruled that Bayou Gulch had no interest in the adjudicated water rights since the quitclaim deeds from the Blums, APE and the Talley Partnership to Bayou Gulch preceded adjudication of the water rights. The district court further found that the Talley Partnership owned a ninety percent interest in the water rights.[11] The district court concluded that BLC owned a ten percent share of the decreed water rights due to Fred Blum's transfer of his share of the water rights during the settlement of the present action. As to the personal liability of the Talley Partnership, the district court found that the Talley Partnership was not liable because it did not assume any recourse obligation under the note when it entered into the cotenancy agreements with the Blums. Finally, the district court dismissed the implied covenant of good faith and fair dealing counterclaims of Bayou Gulch and the Talley Partnership.

BLC appealed the district court's rulings to the court of appeals and the defendants, Talley, the Talley Partnership, Bayou Gulch and APE, cross-appealed. Pursuant to C.A.R. 50, BLC petitioned this court for certiorari and Bayou Gulch cross-petitioned for certiorari prior to judgment. We granted certiorari to determine:

(1) Whether a deed of trust can encumber unadjudicated nontributary water rights.

(2) Alternatively, when a party acquires an ownership interest in land, then applies for a water court adjudication of rights to nontributary water underlying the land, then conveys his interest in the land to a partnership of which he is a partner, then obtains the water court adjudication previ-

---

11. The district court concluded that no nontributary water rights passed to Bayou Gulch because the rights could not be conveyed by quitclaim deed prior to adjudication. Our holding today vitiates that threshold conclusion. Further, the district court appears to have reached the 90% figure by combining the 80% interest owned by

the Talley Partnership in 1984 when the water court application was filed with a 10% interest conveyed to Talley individually in "1999" (the deed probably was dated in 1990, however, no recording information verifies that assumption) from Albert Blum.

ously requested, then conveys his interest in the partnership to a second party, and then conveys his interest in the adjudicated water rights to a third party, who owns the water rights? (In other words, who owns interests in unadjudicated and adjudicated nontributary water rights and how may such interests be conveyed?)

(3) Whether the district court erred in granting summary judgment dismissing claims for personal liability under a promissory note where there were genuine issues of material fact regarding whether the defendants assumed obligations under the note?

(4) Whether the district court erred in dismissing a counterclaim for alleged bad faith by a lender, or erred in failing to set forth specific reasons, both factual and legal, for the dismissal, thereby precluding any meaningful review?

We now hold that the right to extract nontributary ground water not in a designated basin may be encumbered prior to adjudication. Because the right to extract nontributary ground water is incident to land ownership, until explicit severance of this right to extract from the land either through the consent provision of section 37–90–137(4), 15 C.R.S. (1995 Supp.), or through sale, a court must presume that the right to extract passes with the land. Ultimately, however, a court must determine as a factual matter whether the parties intended to transfer or encumber the right to extract nontributary ground water with the burden of persuasion on the party claiming that this right did not pass with the land. We also reverse the district court's grant of summary judgment for Bayou Gulch on the issue of assumption. Therefore, we reverse the district court's ruling as to issues one,

two, and three and remand for a determination of the intent of the parties, taking into account the evidentiary burdens delineated in this opinion. As to issue four of our grant of certiorari, we affirm the district court's ruling.

## II.

### A.

█ In order to resolve this case, we must first determine whether a landowner has a property interest in the extraction of nontributary ground water prior to water court adjudication. BLC contends that although *Southwestern Colorado* provides a starting point for analysis of the law of nontributary ground water rights, the case does not resolve the issue. BLC argues that the statutory scheme governing nontributary ground water rights codified at section 37–90–137, 15 C.R.S. (1990 & 1995 Supp.), bestows on landowners a protected interest in the nontributary ground water underlying their land prior to water court adjudication of those rights. Moreover, BLC claims that this interest may be encumbered by a deed of trust. Bayou Gulch, however, argues that our decision in *Southwestern Colorado* is dispositive of the question now before us. Moreover, Bayou Gulch contends that section 37–90–137 does not vest any property interest in surface owners prior to application for a well permit and ultimate adjudication of the nontributary ground water rights. We agree with BLC and define the property interest in the nontributary ground water as a right to extract ground water in accordance with the applicable statutory provisions.[12]

12. To understand the issues in this case, it is important to distinguish between tributary and nontributary ground water. Therefore, we provide brief definitions of some of the terms used in this opinion. *See generally Southwestern Colorado,* 671 P.2d at 1300 n. 2. "Ground water" or "underground water" means "any water not visible on the surface of the ground under natural conditions." § 37–90–103(19), 15 C.R.S. (1990). Section 37–90–103(10.5), 15 C.R.S. (1990), defines "nontributary ground water" as "ground water, located outside the boundaries of any designated ground water basins in existence on Jan-

uary 1, 1985, the withdrawal of which will not, within one hundred years, deplete the flow of a natural stream ... at an annual rate greater than one-tenth of one percent of the annual rate of withdrawal." "Tributary ground water" means water in an unconsolidated alluvial aquifer of sand, gravel, and other sedimentary material and all other waters hydraulically connected thereto which can influence the rate or direction of movement of the water in that alluvial aquifer or natural stream. *See* § 37–92–103(11), 15 C.R.S. (1990).

*Southwestern Colorado* arose in the context of certain parties filing applications for determinations of conditional water rights in tributary and nontributary ground water in some or all of the seven water divisions of the state. 671 P.2d at 1300. Numerous objectors opposed those applications, some of whom brought an original proceeding in this court pursuant to C.A.R. 21 requesting that the cases be consolidated and assigned to a single water judge for resolution of common issues of law. *Id.* We granted the request and assigned the consolidated case to a special water judge to determine five issues. *Id.* at 1301. As a threshold matter, we directed the special water judge to determine whether nontributary waters in Colorado are subject to appropriation.[13] The water judge found that nontributary ground waters outside a designated basin were subject to appropriation under the authority of section 37–90–137, 15 C.R.S. (1982 Supp.), which provided for issuance of well permits by the state engineer. *Southwestern Colorado,* 671 P.2d at 1302. On appeal, we reversed the special water judge's determination and held that nontributary water is not subject to appropriation under the Colorado Constitution or to adjudication under then applicable law: the Water Rights Determination and Administration Act of 1969. *Id.* at 1303 (construing §§ 37–92–101 to –602, 15 C.R.S. (1973)).[14]

We began our examination of the special water judge's ruling by reviewing the historical basis of water law. *See Southwestern Colorado,* 671 P.2d at 1304. We noted that Colorado and other western states derived their authority to develop a system of water law from the federal government. *Id.* Although Congress encouraged development of the land and mineral resources of the western states through land grants, Congress did not grant ownership of water along with these grants. *Id.* at 1306. Rather, with certain limitations not relevant here, Congress deferred to state law for the creation of interests in water and the regulation and distribution of water. *Id.* at 1304–07, 1306–07 n. 14. Thus, to determine whether nontributary ground water could be appropriated like surface or tributary ground water, we analyzed the state law in effect at the time the case was at issue.

We first considered whether the law governing tributary water rights applied to nontributary ground water. We interpreted Article XVI, Sections 5 and 6 of the Colorado Constitution. Section 5 provides: "The water of every natural stream, not heretofore appropriated, within the state of Colorado, is hereby declared to be the property of the public, and the same is dedicated to the use of the people of the state, subject to appropriation as hereinafter provided." Colo. Const. art. XVI, § 5. We held that the constitution created the right of prior appropriation and applied it to the "waters of any natural stream," which by definition did not include nontributary ground water. *Southwestern Colorado,* 671 P.2d at 1308. Thus, nontributary ground water was not subject to the constitutional right of prior appropriation. *Id.; see also American Water Dev. v. City of Alamosa,* 874 P.2d 352, 369 (Colo. 1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 575, 130 L.Ed.2d 491 (1994). We further recognized that section 37–92–203(1) governing water court jurisdiction only referred to tributary water. Thus, we held that water courts at that time did not have jurisdiction to adjudicate rights to nontributary ground water.[15]

Turning our attention to the law governing nontributary ground water, we rejected the notion that nontributary water was owned in fee by the overlying landowner and concluded that ownership of nontributary ground water outside designated basins is purely a

---

13. In the event the special water judge answered the threshold question in the affirmative, we directed the judge to address the four subsidiary questions.

14. During our consideration of *Southwestern Colorado,* the legislature amended the Water Rights Act of 1969 to provide for adjudication of nontributary ground water rights in water court. *See* § 37–92–203(1), 15 C.R.S. (1990); ch. 516, sec. 1, § 37–92–203, 1983 Colo. Sess. Laws 2079.

15. The legislature amended this section to provide for water court jurisdiction to adjudicate nontributary ground water rights. *See supra* note 14.

function of statute.[16] We rejected the assertion that landowners had an absolute property right to water underlying their lands. *Southwestern Colorado,* 671 P.2d at 1316. We stated:

> [G]iven the state's plenary control over development of water law, the traditional property concept of fee ownership is of limited usefulness as applied to nontributary ground water and serves to mislead rather than advance understanding in considering public and private rights to utilization of this unique resource.

*Id.* at 1316. Despite our holding that landowners do not have an absolute right to ownership of water underneath their land, we did not resolve the question which has arisen in the present case regarding what right, if any, surface landowners do have in nontributary ground water. Rather, we indicated that any rights must be derived from the statutory scheme governing nontributary ground water. *See id.* at 1318–19 (holding that in enacting section 37–90–137(4) legislature exercised its power to legislate regarding nontributary ground waters unconstrained by any claimed private rights derived under federal patents).

Thus, in our decision in *Southwestern Colorado,* we determined that the development of nontributary ground water law in Colorado is entrusted to the legislature. We held that ownership of nontributary ground water may only be determined with reference to the legislative enactments governing such water. Therefore, in order to answer the questions now before us regarding the definition of a surface landowner's rights in nontributary ground water, we must interpret the statutes regulating such water.

### B.

The Colorado General Assembly provided no guidance for the regulation of nontributary ground water not in a designated basin until 1965. In 1965, the legislature enacted section 148–18–36, authorizing the state engineer to issue well permits to potential users

of nontributary ground water. *See* ch. 319, sec. 1, § 148–18–36, 1965 Colo. Sess. Laws 1246, 1266–67. The state engineer could issue a permit upon application of a user. *Id.* The statute made no reference to ownership of land other than requiring the applicant to provide in the application the name of the owner of the land on which the well would be constructed.

In 1973, the General Assembly enacted Senate Bill 213 (1973) amending section 148–18–36 and providing more comprehensive guidelines for the state engineer to follow when issuing well permits. *See* ch. 441, sec. 1, § 148–18–36, 1973 Colo. Sess. Laws 1520. The amended statute was codified at section 37–90–137(4), 15 C.R.S. (1973). In Senate Bill 213, the legislature established that the right to withdraw nontributary ground water should be distributed on the basis of land ownership. *See* § 37–90–137(4), 15 C.R.S. (1973). Senate Bill 213 directed the state engineer, in issuing well permits to withdraw nontributary ground water, to consider "only that quantity of water underlying the land owned by the applicant or by the owners of the area, by their consent" to be available for withdrawal. Thus, applicants could only apply for a well permit for nontributary ground water underlying their own land or underlying the land of those who consented. In *Willows Water District v. Mission Viejo Co.,* 854 P.2d 1246, 1251 n. 14 (Colo.1993), we recognized that Senate Bill 213 required the consent of the owner of the land on which a well was to be drilled as a condition to the issuance of a permit by the state engineer.

In 1985, in response to our decision in *Southwestern Colorado,* the legislature further clarified the requirements for issuance of a well permit and the construction of wells outside a designated basin when it enacted Senate Bill 5 (1985), presently codified at section 37–90–137(4), 15 C.R.S. (1995 Supp.). *See* ch. 285, sec. 3, § 37–90–137(4), 1985 Colo. Sess. Laws 1160. Section 37–90–137(4)(b)(II), 15 C.R.S. (1995 Supp.), states:

---

16. *Id.* at 1318; *see also* § 37–82–101, 15 C.R.S. (1990) ("All nontributary ground water shall be subject to such administration and use as the general assembly may provide by law."); *Ameri-*

*can Water Dev.,* 874 P.2d. at 369. At the time of the *Southwestern Colorado* decision the applicable law was codified at § 37–90–137, 15 C.R.S. (1982 Supp.).

Subject to the provisions of subsection (1) and (2) of this section, the amount of such ground water available for withdrawal shall be that quantity of water, exclusive of artificial recharge, underlying the land *owned by the applicant or underlying the land owned by another:*

(A) *Who has consented in writing to the applicant's withdrawal;* or

(B) Whose consent exists by virtue of a lawful municipal ordinance or a quasi-municipal district resolution . . .; or

(C) Who shall be deemed to have consented to the withdrawal of ground water pursuant to the provisions of subsection (8) of this section.

(Emphasis added.) This statutory provision clarifies the legislature's intent that the right to use and control nontributary ground water is tied to land ownership. The landowner has the primary right to apply for a well permit. No other individual may apply for a well permit without the landowner's consent. Furthermore, the statute measures the amount of nontributary ground water available for use "as the amount which underlies the land." [17] The legislature's enactment of Senate Bill 5 confirmed and clarified the connection between ownership of land and nontributary ground water rights, which was first announced in Senate Bill 213.

The legislature's recent enactment of section 37–90–137(4)(b.5)(I), 15 C.R.S. (1995 Supp.), in 1993, further solidifies the connection between ownership of land and the right to withdraw nontributary ground water. *See*

ch. 38, sec. 1, § 37–90–137(4)(b.5)(I), 1993 Colo. Sess. Laws 85. Section 37–90–137(4)(b.5)(I) provides:

An applicant claiming to own the overlying land or to have the consent of the owner of the overlying land as contemplated in sub-subparagraph (A) of subparagraph (II) of paragraph (b) of this subsection (4) shall furnish to the state engineer, in addition to evidence of such consent, evidence that the applicant has given notice of the application by registered or certified mail . . . to every record owner of the overlying land and to every person who has a lien or mortgage upon, or deed of trust to, the overlying land recorded in the county in which the overlying land is located.

This section protects the right to withdraw nontributary ground water by requiring those who seek a well permit to prove that they own the land or have the consent of the landowner and that they have notified all record owners and all holders of encumbrances on the overlying land.[18] This provision thus ensures that landowners and those holding liens, mortgages or deeds of trust on the land will receive notice that someone else is claiming the right to withdraw nontributary ground water under that land.[19] The implicit assumption is that the right to withdraw the nontributary ground water is a valuable right associated with ownership of, or a record interest in, the overlying land.

From this review of the statutory scheme, it is clear that the legislature intended from its enactment of Senate Bill 213 and

---

**17.** Rule 8, 2 C.C.R. 402–7 (1986), further provides in part that:

> A. The allowed average annual amount of withdrawal shall be based on an aquifer life of 100 years in accordance with Section 37–90–137(4)(b)(I), C.R.S. The allowed average annual amount of withdrawal for all of the wells on the overlying land shall not exceed one percent of the total amount of water, exclusive of artificial recharge, recoverable from a specific aquifer beneath the overlying land. . . .
>
> B. The total amount of water recoverable from a specific aquifer from a well or wells shall be determined by multiplying the number of acres of overlying land as adjusted by Rule 8.C., if necessary, by the average number of feet of saturated aquifer materials in the aquifer underlying those lands by the average specific yield of those saturated aquifer materials.

**18.** We note that a decree may be obtained from the water court confirming rights to nontributary water, but a decree is not required: "Rights to nontributary water outside designated ground water basins may be determined by the water court." § 37–90–137(6), 15 C.R.S. (1995 Supp.). A permit, however, is required for extraction.

**19.** The legislature enacted this section after the initiation of this lawsuit. Therefore, we do not base our holding that a surface landowner has a right in the nontributary ground water underneath his land on this provision. We merely discuss it as further support for our conclusion that nontributary ground water rights are connected to and an incident of ownership of land.

later Senate Bill 5 to confer control over nontributary ground water to owners of the overlying land. *See American Water Dev. v. City of Alamosa,* 874 P.2d 352, 369 (Colo. 1994) (recognizing that the right to withdraw nontributary ground water is based on ownership of the overlying land), *cert. denied,* —— U.S. ——, 115 S.Ct. 575, 130 L.Ed.2d 491 (1994). The legislature has done so by making ownership of land or consent of the landowner a prerequisite to application for a well permit and ultimately to the utilization of ground water. Through these enactments, the legislature has created an inchoate right to control and use a specified amount of nontributary ground water in owners of the overlying land.

■ Because this right is incident to ownership of land, it is not dependent upon formal adjudication by a water court. For instance, the right to withdraw nontributary ground water may be severed from the land prior to adjudication through the consent provisions of section 37–90–137(4) or by sale.

■ In this way, the rights that the legislature created through enactment of Senate Bills 213 and 5 as embodied in section 37–90–137(4) are different from tributary water rights. To obtain a right to tributary water, an individual must divert the water and put it to beneficial use. *See Navajo Dev. Co., Inc. v. Sanderson,* 655 P.2d 1374, 1377 (Colo.1982) (explaining: "The first person to divert unappropriated water and to apply it to a beneficial use has a water right superior to subsequent appropriators from the same water source."). A water court decree adjudicating a water right merely confirms the existence of that right which arose initially by application of water to beneficial use. *Humphrey v. Southwestern Dev. Co.,* 734 P.2d 637, 641 (Colo.1987); *Cline v. Whitten,* 144 Colo. 126, 129, 355 P.2d 306, 308 (1960);

*Cresson Consol. Gold Mining & Milling Co. v. Whitten,* 139 Colo. 273, 283, 338 P.2d 278, 283 (1959). The decree does not itself create or grant any rights; rather, it serves as evidence of rights previously acquired. *Humphrey,* 734 P.2d at 641. An individual's appropriation of tributary water and application of that water to beneficial use gives rise to a water right regardless of land ownership, whereas nontributary ground water is statutorily allocated according to land ownership.

■ We describe the right to extract nontributary ground water prior to construction of a well and/or adjudication as inchoate to emphasize that it is not a vested right. *See Black's Law Dictionary* 762 (6th ed.1990) (defining an inchoate interest as an interest in real estate which is not a present interest, but which may ripen into a vested estate). The right does not vest until the landowner or an individual with the landowner's consent constructs a well in accordance with a well permit from the state engineer and/or applies for and receives water court adjudication. Until vesting occurs, the right to extract nontributary ground water is subject to legislative modification or termination.[20]

■ In conclusion, in *Southwestern Colorado,* we rejected the assertion that surface landowners have absolute ownership of nontributary ground water underlying their land. Instead, we held that any rights a landowner has in nontributary ground water would arise as a result of legislative enactments. In this case, we hold that the legislature, through its enactment of Senate Bills 213 and 5 presently codified at section 37–90–137(4), created a limited right to such water in surface landowners. This right arises as a result of ownership of land and exists prior to adjudication of the water right in water court. As

20. The statutory scheme defines the contours of a landowner's right to extract nontributary ground water. Until the right becomes vested, the legislature may modify or limit that right. For example, § 37–90–137(8), 15 C.R.S. (1990), authorizes a municipal or quasi-municipal water supplier who is the principal provider of public water service to landowners within a certain municipal or quasi-municipal boundary to pass an ordinance deeming that the landowners of the land overlying the ground water have consented to the supplier's use of the water. Thus, a landowner's right to extract nontributary ground water underlying land is subject to this provision and limited by it. It does not include the right to withhold consent from a municipal supplier under certain circumstances. Likewise, a landowner must comply with statutory requirements in order to utilize the water right.

such, it may be transferred or encumbered before a decree is issued.

## C.

■ Because we hold that the right to extract nontributary ground water exists and may be transferred prior to actual water court adjudication of a right to nontributary ground water, we turn now to a determination of whether the right to withdraw nontributary ground water in this case was encumbered by the deed of trust Warren executed in favor of BLC. BLC argues that we should presume that the deed of trust in this case encumbered all of Warren's interest in the property and thus, included any right to extract nontributary ground water.[21] In the alternative, BLC argues that the question of whether a deed of trust encumbers nontributary water rights depends on the intent of the grantor. We conclude that because the right to withdraw nontributary ground water is integrally associated with and incident to ownership of land, such right is presumed to pass with the land either in a deed or a deed of trust unless explicitly excepted from the conveyance instrument. A party claiming that the right to withdraw nontributary ground water was not transferred with the land must prove that the grantor affirmatively did not intend to transfer such right.

■ Like transfers of tributary water rights, the right to withdraw nontributary ground water may be transferred with or without the land. Ultimately, whether that right is transferred with the land is a question of fact that depends on the intention of the grantor and the particular circumstances of the case. In Colorado, it is well settled that a water right is a "property right separate and apart from the land on which it is used." *Nielson v. Newmyer,* 123 Colo. 189, 192–93, 228 P.2d 456, 458 (1951); *Arnold v. Roup,* 61 Colo. 316, 325, 157 P. 206, 210 (1916); *Arnett v. Linhart,* 21 Colo. 188, 190, 40 P. 355, 355 (1895). In the case of tributary water rights:

> [W]hether a deed to land conveys the water right depends on the intention of the grantor, which is to be gathered from the express terms of the deed; or when it is silent as to the water right, from the presumption that arises from the circumstances, and whether such right is or is not incident to and necessary to the beneficial enjoyment of the land.

*Arnett,* 21 Colo. at 190, 40 P. at 355. Thus, whether tributary water rights are conveyed in a deed is a question of fact which depends on the intention of the parties and the circumstances surrounding the transfer. *Kinoshita v. North Denver Bank,* 181 Colo. 183, 188, 508 P.2d 1264, 1267 (1973); *Hastings & Heyden Realty Co. v. Gest,* 70 Colo. 278, 283, 201 P. 37, 39 (1921). Where a deed is silent no presumption arises as to the intent of the parties in regard to the transfer of water rights. *See Travelers Ins. Co. v. Janitell Farms, Inc.,* 44 Colo.App. 34, 36–37, 609 P.2d 1116, 1118 (1980).

■ Unlike rights to tributary water, rights in nontributary ground water arise either by virtue of the ownership of the overlying land or consent of the owner of the overlying land. Because the right to withdraw nontributary ground water is so tied to land ownership, courts should presume that such right passes with the land in a deed and is encumbered by a deed of trust encumbering the land unless these water rights are explicitly excepted from the deed or deed of trust.[22] The burden of proof should be placed on the party claiming that the nontri-

---

21. BLC also argues that the deed of trust encumbered the decreed water rights under the after-acquired title doctrine. Because we hold that the right to extract exists by virtue of the ownership of land and that the decree merely confirms those rights, we decline to address this after-acquired title argument.

22. This rule is similar to the rule for mineral rights. As we stated in *O'Brien v. Village Land Co.,* 794 P.2d 246, 249 (Colo.1990), "It is well established that a conveyance of land by general description, without any reservation of a mineral interest, passes title to both the land and the underlying mineral deposits." *See generally* 3 *American Law of Mining* § 82.01 (Rocky Mountain Mineral Law Foundation ed.1995). By virtue of the consent provision of § 37–90–137, the statutory scheme makes clear that a landowner may sever the right to extract from the ownership of the land. In this case, we merely hold that in the absence of an explicit severance, a court should presume that such rights were transferred along with the land.

butary ground water was not transferred or encumbered with the land.

■■■■ We believe this rule is most compatible with and best effectuates the structure of the statutory scheme governing nontributary ground water rights which conditions applications for well permits on ownership of land or consent of the landowner. For example, if a landowner who has not applied for a well permit transfers his or her land, under section 37–90–137(4) he or she may not apply for a well permit without the consent of the new landowner. If the transferor landowner wished to reserve the right to use the nontributary ground water, the better practice would be to memorialize such intent by a reservation of the water rights in the deed. Therefore, requiring explicit reservation of water rights comports with the structure of the permit system for the right to extract nontributary ground water and the better practice of individuals transferring these rights. Thus, we hold that, in general, parties who do not explicitly except the right to extract nontributary water from their deeds must be presumed to intend to transfer such right with the land.[23]

### D.

■■■ In the present case, the deed of trust that BLC holds encumbering the Bayou Gulch land does not explicitly except nontributary ground water rights. At trial, Warren testified that he intended the deed of trust to encumber all the rights he received with the land. Thus, both the deed of trust and the intent of the grantor, Warren, suggest that the deed of trust encumbered both the land and the right to extract nontributary ground water underlying the land. Bayou Gulch presented some evidence at the trial that Warren intended the right to withdraw nontributary water to remain unencumbered. In particular, Bayou Gulch showed that the deed transferring the land from BLC to Warren specifically included water rights

while the deed of trust did not. Bayou Gulch contended that the discrepancy between the deed of trust and the deed was evidence that Warren did not encumber any nontributary water rights. Because this is ultimately a factual question that must be resolved by the trial court, we remand the case to the district court for further findings utilizing the evidentiary burdens provided in this opinion.[24]

### III.

■■■ In addition to the dispute between the parties as to whether the right to extract nontributary ground water was encumbered by the deed of trust, BLC also asserted that Bayou Gulch assumed liability for the promissory note, including the recourse provision. Bayou Gulch filed a motion for summary judgment regarding the recourse liability claim which the district court granted.

BLC claims that the district court erred in granting Bayou Gulch's motion for summary judgment on the recourse liability claim. BLC argues that both the Bayou Gulch partnership agreement and the modifications of the note by Bayou Gulch create a genuine issue of material fact as to whether Bayou Gulch assumed the recourse obligation under the promissory note. We agree.

■■■■ "Summary judgment is a drastic remedy and is never warranted except on a clear showing that there exists no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Graven v. Vail Assocs., Inc.,* 909 P.2d 514, 516 (Colo.1995); *Churchey v. Adolph Coors Co.,* 759 P.2d 1336, 1339–40 (Colo.1988). In determining the propriety of summary judgment, the non-moving party is entitled to all favorable inferences that may reasonably be drawn from the undisputed facts. *Graven,* 909 P.2d at 516. Furthermore, all doubts as to whether a triable issue of fact exists must be resolved against the moving party. *Id.* To determine if a genuine issue of fact exists as to whether Bayou

---

23. The presumption may be overcome by a showing that the landowner previously transferred the right to withdraw ground water to a third party or entity explicitly or by operation of statute. *See* § 37–90–137(4)(b)(II), 15 C.R.S. (1995 Supp.).

24. This conclusion resolves issue one of our grant of certiorari and remands issue two to the district court.

Gulch assumed the promissory note at issue, we must first review general principles of the law of recourse liability.

■ When a seller transfers real property that is encumbered by a deed of trust, the buyer may either take the property subject to the encumbrance or assume the obligation secured by the encumbrance itself. *See generally* 3 Richard R. Powell, *Powell on Real Property* at 37–242 (1996). If the buyer acquires the land subject to the encumbrance, the land continues to secure the obligation but the buyer is not personally liable for the debt. However, the grantor or seller remains personally liable. In contrast, one who assumes an existing encumbrance becomes personally liable for the underlying debt and the grantor becomes the surety. *Cave v. Belisle,* 117 Colo. 180, 182, 184 P.2d 869, 870 (1947); *Iowa Nat'l Mut. Ins. Co. v. Central Mortgage & Inv. Co.,* 708 P.2d 480, 483 (Colo.App.1985); *Ruther v. Thomas,* 43 Colo.App. 435, 437, 604 P.2d 703, 705 (1979). The assuming grantee is subject to foreclosure on the property, action on the note, or both. *Ruther,* 43 Colo.App. at 437, 604 P.2d at 705; *Smith v. Certified Realty Corp.,* 41 Colo.App. 170, 172, 585 P.2d 293, 294 (1978), *aff'd,* 198 Colo. 222, 597 P.2d 1043 (1979).

■ Merely purchasing encumbered property does not constitute a personal assumption of the underlying debt.

> "An agreement merely to take land subject to a specified incumbrance, is not an agreement to assume and pay the incumbrance. The grantee of an equity of redemption, without words in the grant importing in some form that he assumes the payment of a mortgage does not bind himself personally to pay the debt. There must be words importing that he will pay the debt to make him personally liable."

*Lloyd v. Lowe,* 63 Colo. 288, 290, 165 P. 609, 610 (1917) (quoting *Elliott v. Sackett,* 108 U.S. 132, 140, 2 S.Ct. 375, 380, 27 L.Ed. 678 (1883)); *see also Bernhardt v. Hemphill,* 878 P.2d 107, 110 (Colo.App.1994). Thus, whether the buyer agrees to assume a debt secured by an encumbrance from the seller is a matter of contract and, as such, all contractual essentials, such as a meeting of minds culminating in agreement and valid consideration, must exist in order for the assumption agreement to be enforceable. *Elliott v. Denver Joint Stock Land Bank,* 107 Colo. 231, 235, 110 P.2d 979, 981 (1941). Although an assumption agreement must be express and in writing, there is no requirement that any particular language must be used in the granting instrument in order to create an assumption. *Lloyd,* 63 Colo. at 290, 165 P. at 610. Ordinarily, there is an assumption clause in the contract which specifically states that the grantee assumes and agrees to pay the debt. *See, e.g., Elliott,* 107 Colo. at 232, 110 P.2d at 979. However desirable, such a clause is not necessary if other language in the grant evidences an intent for the grantee to assume the debt.

In this case, BLC claims that the Bayou Gulch partnership agreement constituted an assumption of the promissory note executed by Warren.[25] The partnership agreement states: "Each Partner shall discharge the annual payments and the balloon payments of the principal balance of [the Note to Plaintiff] in proportion to [each Partner's] ownership interest." BLC further offered deposition testimony of Fred Blum, one of the parties to the partnership agreement, indicating that it was his understanding that the partnership assumed his responsibilities under the note, including the recourse liability. In the alternative, BLC claims that by executing the agreements modifying the payment terms of the note, Bayou Gulch obligated itself to making payments under the note.

■ Taken as a whole, the evidence presented by BLC raises an issue of material fact as to whether Bayou Gulch assumed the note. The partnership agreement seems to refer to the entire debt and does not distinguish between the recourse and nonrecourse components. It divides payment and responsibility for the entire debt among all the partners in proportion to their respective ownership shares. To read the partnership

---

**25.** The Blums expressly assumed the promissory note when they acquired the property from Warren. The quitclaim deed conveying their 20% interest in the property to Bayou Gulch did not make reference to the deed of trust.

agreement as only applying to the nonrecourse debt would create the anomalous result that although the Blums only owned twenty percent of the partnership and were thereby primarily responsible for twenty percent of the nonrecourse debt, their liability for 100% of the recourse debt also remained primary. This seems contrary to the intent and actions of the parties. In fact, Fred Blum explained in his deposition that it was his understanding that the partnership assumed responsibility for the entire debt, including the recourse liability.[26]

This interpretation is also supported by the parties' actions in modifying the debt. The modification agreements suggest that all parties were acting as if the partnership had primary responsibility for the note. The agreement itself referred to BLC as "lender" and Bayou Gulch as "borrower." Further, in the modification agreement Bayou Gulch agreed to make payments on the debt. In addition, the modification agreements potentially increased the amount of recourse debt due under the note.[27] It did so, however, without the Blums' formal consent. Thus, the parties acted as if Bayou Gulch had assumed the note.

■ Bayou Gulch, relying on *Crebbin v. Shinn*, 19 Colo.App. 302, 74 P. 795 (1903), claims that execution of an extension agreement does not constitute an assumption of the underlying debt. Although we agree with Bayou Gulch that execution of an extension agreement does not automatically constitute an assumption, we disagree with Bayou Gulch's assertion that an extension agreement can never constitute an assumption. In *Crebbin*, Robert Shinn executed a promissory note and secured it with a deed of trust on property he owned. Thereafter, Robert Shinn transferred the property to E.E. Shinn who continued to make payments on the promissory note. *Crebbin*, 19 Colo.App. at 303, 74 P. at 795. E.E. Shinn then entered into an extension agreement in which the terms of the note were altered. *Id.* at 304, 74 P. at 795. When E.E. Shinn discontinued making payments on the note, the lender foreclosed on the property and demanded the balance due from E.E. Shinn, claiming that the extension agreement constituted an assumption of the note. *Id.* The court of appeals held that the extension agreement did not constitute an assumption. *Id.* at 307, 74 P. at 796. In reaching this conclusion, the court relied on the language of the extension agreement, the intention of the parties, the apparent purposes of making the contract, and the surrounding circumstances. *Id.* at 306, 74 P. at 796. Thus, from *Crebbin*, it is clear that the mere execution of an extension agreement does not constitute an assumption of the underlying debt. Rather, whether an extension agreement constitutes an assumption is a question of fact which depends upon the language of the agreement, the surrounding circumstances, and the intention of the parties.

In the present case, we hold that BLC has presented enough evidence to raise an issue of material fact as to whether Bayou Gulch assumed the Warren promissory note in its partnership agreement or in the modification agreements. We remand this issue to the district court for hearing. The district court should consider the language of the relevant

---

**26.** Bayou Gulch claims that BLC may not pursue a claim against the partnership based on the partnership agreement because BLC is not a third party beneficiary of the partnership agreement. A mortgagee is able to enforce an assumption agreement against a grantee of the mortgagor on the theory that the mortgagee is a third party beneficiary of the assumption agreement between the original mortgagor and his or her grantee. *See Elliott*, 107 Colo. at 235, 110 P.2d at 980–81. In order to be a third party beneficiary of a contract, the parties to the contract must intend to bestow a benefit on the third party. *E.B. Roberts Constr. Co. v. Concrete Contractors, Inc.*, 704 P.2d 859, 865 (Colo.1985). In this case, the partnership agreement states: "The right of the Partnership or the Partners to re-

quire any additional capital contributions under the terms of the agreement shall not be construed as conferring any rights or benefits to or upon any [person] not a party to the agreement." The meaning of this phrase and whether it precludes Bayou Gulch from being a third party beneficiary to the provisions of the partnership agreement apportioning responsibility to make payments on the note is a question of fact that must be resolved on remand to the trial court.

**27.** The parties disagree as to whether the recourse liability under the promissory note could be increased above $100,000. We make no determination here regarding this dispute.

documents, the intention of the parties, and the surrounding circumstances, to determine whether Bayou Gulch assumed the note and is therefore subject to the recourse liability provision of the note.

## IV.

We next address Bayou Gulch's counterclaim that BLC breached its obligation of good faith and fair dealing implied in the deed of trust. Bayou Gulch argued before the district court that BLC breached its obligation of good faith and fair dealing in three respects: (1) by asserting a personal recourse liability claim against Bayou Gulch in order to pressure Bayou Gulch into deeding the water rights to BLC; (2) by asserting a recourse liability figure that exceeded $100,000, allegedly the amount allowable under the recourse provision of the note; and (3) by asserting a claim for nontributary water rights which Bayou Gulch claims were not encumbered by the deed of trust. After the trial, the district court dismissed Bayou Gulch's counterclaim without making explicit findings. Bayou Gulch argues that because the district court did not make explicit findings regarding its counterclaim, appellate review is not possible. Bayou Gulch argues that we should reverse the district court's ruling and remand the case for more explicit findings. We decline to do so.

We first note that although the district court did not make specific findings of fact, we may determine pure questions of law and affirm on that basis. *Gross v. Appelgren,* 171 Colo. 7, 16–17, 467 P.2d 789, 793 (1970); *Klutts v. Parker,* 158 Colo. 594, 596, 409 P.2d 275, 276 (1965). Because we affirm the district court's dismissal of Bayou Gulch's counterclaim as a matter of law, the district court's failure to find specific facts is not critical. *See Zigan Sand & Gravel, Inc. v. Cache La Poudre,* 758 P.2d 175, 181 (Colo. 1988) (indicating that although the trial court did not set forth the analytical framework that led to its conclusion, we affirmed the result as supportable on at least two bases); *Colorado v. Franc,* 165 Colo. 69, 76, 437 P.2d 48, 51 (explaining that when the trial court enters a correct judgment for the wrong reason we will nevertheless affirm), *cert. denied,* 392 U.S. 928, 88 S.Ct. 2284, 20 L.Ed.2d 1385 (1968); *see also Biel v. Alcott,* 876 P.2d 60, 64 (Colo.App.1993) (stating: "[A]n appellate court will not remand an action to the trial court if it reaches the right result by incorrect reasoning or, as in this case, by not articulating its reasoning.").

We have determined that implied covenants of good faith and fair dealing apply to certain contracts under Colorado law. *Amoco Oil Co. v. Ervin,* 908 P.2d 493 (Colo. 1995); *Wells Fargo Realty Advisors Funding, Inc. v. Uioli, Inc.,* 872 P.2d 1359, 1362 (Colo.App.1994). Whether a deed of trust is such a contract has not been addressed in our prior cases. Generally, the implied covenant of good faith and fair dealing is used to effectuate the intention of the parties or to honor their reasonable expectations in entering into the contract. *Amoco Oil Co.,* 908 P.2d at 498; *see also State Farm Mut. Auto. Ins. Co. v. Nissen,* 851 P.2d 165, 168 (Colo. 1993); *Davis v. M.L.G. Corp.,* 712 P.2d 985, 989 (Colo.1986). This is necessary when the manner of performance under specific contract terms allows for discretion on the part of either party. Thus, we have implied the duty of good faith and fair dealing when one party has discretionary authority to determine certain terms of the contract, such as quantity, price, or time. *Amoco Oil Co.,* 908 P.2d at 498 (holding that implied covenant of good faith and fair dealing applied to Amoco's discretion under rental contract to determine rental terms).

Although we have applied the implied covenant of good faith and fair dealing where the parties have left a contract term to one party's discretion, we have never applied the covenant of good faith and fair dealing to the situation advocated by Bayou Gulch here. Hence, even if the implied covenant were to arise in a deed of trust context, it would not be violated by BLC's actions.

Essentially Bayou Gulch is claiming that BLC violated the covenant merely by asserting claims in a lawsuit. Bayou Gulch asserts that a party may breach the covenant of good faith and fair dealing by bringing a lawsuit to settle a dispute over the meaning of a contract. We decline to extend

the covenant to such a situation.[28] We further note that to the extent that Bayou Gulch is claiming that BLC has brought a frivolous lawsuit or engaged in malicious prosecution, there are other remedies available to it. *See* C.R.C.P. 11; *Slee v. Simpson*, 91 Colo. 461, 465, 15 P.2d 1084, 1085 (1932) (recognizing action for civil malicious prosecution).

Because Bayou Gulch has not sustained its claim of a breach of the implied covenant of good faith and fair dealing against Bayou Gulch, we affirm the district court's dismissal of this claim.

## V.

In conclusion, we hold that the legislature, through its enactment of Senate Bill 213 (1973) and Senate Bill 5 (1985), presently codified at section 37–90–137(4), 15 C.R.S. (1995 Supp.), has created in landowners an inchoate right to extract nontributary ground water underneath their land. This right arises prior to adjudication by a water court and is subject to transfer. A deed transferring the land automatically includes the right to extract nontributary ground water, unless such right is specifically excepted from the transfer. A person claiming that the right to extract the nontributary ground water was not transferred with the land has the burden of proving that this is the case. We therefore conclude that the deed of trust at issue in this case could have encumbered the right to extract nontributary ground water. We reverse the district court's ruling that the right to extract could not have been encumbered by the deed of trust because nontributary ground water rights had not yet been adjudicated by the water court. We remand the case to the district court for a determination as to whether the parties intended to except the right to extract nontributary ground water from the deed of trust, taking into account the evidentiary burdens delineated in this opinion.

We also reverse the district court's entry of summary judgment for Bayou Gulch on BLC's recourse liability claim. We hold that BLC has raised an issue of material fact as to whether Bayou Gulch assumed the note. We therefore remand the case for further hearing on this issue.

▇▇▇ Lastly, we hold that the implied covenant of good faith and fair dealing cannot be invoked to bar a party from bringing a claim based on a disagreement regarding contract terms. Because Bayou Gulch has not alleged sufficient circumstances to sustain a claim, we affirm the district court's dismissal of the counterclaim.

28. We acknowledge that the covenant of good faith and fair dealing may apply to the performance as well as the enforcement of a contract. When applied in the enforcement context it bars dishonest conduct such as raising an imaginary dispute, asserting an interpretation contrary to one's own understanding, or falsification of facts. Restatement (Second) of Contracts § 205 cmt. e (1981). Bayou Gulch does claim that BLC asserted the claim against it for recourse liability contrary to BLC's assertions in its initial pleading that Bayou Gulch had not assumed the note. In responding to this inconsistency, BLC explained that during discovery it learned of facts that led it to believe that Bayou Gulch had assumed the note. Without more evidence, Bayou Gulch has not shown that BLC has acted in such an egregious manner in the lawsuit as to have transgressed the implied covenant of good faith and fair dealing.