**F I L E D**

**UNITED STATES COURT OF APPEALS**

**September 30, 2005**

**TENTH CIRCUIT**

| | |
|---|---|
| BLACK EDUCATION NETWORK, INC., | |
| Plaintiff-Appellant, | |
| v. | No. 04-1461 |
| AT&T BROADBAND, LLC, a Colorado Limited Liability Company; COMCAST CORPORATION, a Pennsylvania corporation; AT&T COMCAST CORPORATION, a Pennsylvania corporation; and DANIELS & ASSOCIATES, L.P., a Colorado Limited Partnership, | (D.C. No. 03-F-0374(PAC)) (D.Colo.) |
| Defendants-Appellees. | |

**ORDER AND JUDGMENT** *

Before **BRISCOE, ANDERSON,** and **O'BRIEN** , Circuit Judges.

Plaintiff Black Education Network (BEN) submitted bids to purchase

various cable television systems from defendants AT&T Broadband, LLC (AT&T)

---

*This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

and Daniels & Associates, L.P. (Daniels). After the systems were awarded to other buyers, BEN filed suit against defendants alleging racial discrimination under 42 U.S.C. § 1981 and Title VI of the Civil Rights Act of 1964, as well as state law claims for fraud, misrepresentation, breach of the covenant of good faith and fair dealing, interference with prospective economic advantage, and negligence. The district court dismissed some of the claims and granted summary judgment in favor of defendants on the remaining claims. BEN now appeals. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

## I.

### *Factual background*

BEN is a minority-owned broadcast company based in New York, New York. BEN is in the business of developing television programming "that presents a . . . predominantly African-American perspective . . . ." App. at 142. It is uncontroverted that BEN has never owned or operated a cable television system.

Defendant AT&T is a Colorado company with its principal place of business in Denver. As of the fall of 2000, AT&T owned and operated cable television systems, including systems in the States of Colorado, Iowa, Illinois, Missouri, Montana, Nevada and Wyoming. For various reasons, including the need to obtain cash to pay down its debt, AT&T decided to sell some of its

2

systems. Accordingly, AT&T retained defendant Daniels as its broker to sell the systems.

In late 2000, Daniels distributed information to potential bidders for the systems, including BEN, and in return obtained initial indications of interest from those potential bidders. In January 2001, BEN and at least nine other potential purchasers were invited to submit bids to purchase the systems located in Illinois, Iowa, Missouri and Nevada. A bid instruction letter setting forth the bid requirements was sent to all the potential purchasers, including BEN.

On January 26, 2001, BEN submitted a bid for the systems in Illinois, Iowa, Missouri and Nevada. BEN offered to purchase all four systems for $2,310,000,000.00. Alternatively, BEN offered to purchase each of the systems separately for varying amounts ($1,500,000,000.00 for the Iowa systems; $218,500,000.00 for the Missouri systems; $91,800,000.00 for the Illinois systems; and $400,000,000.00 for the Nevada systems). With regard to the issue of financing, BEN's bid stated that "financing [wa]s being arranged" by two entities (Nedder, Moore & Associates, LLC, in conjunction with the Robinson-Humphrey Company, LLC), and listed "Sarkice T. Nedder" as the "contact person." Id. at 166. When Daniels contacted Mr. Nedder, he was unable to provide the specific financial information requested in the bid instruction letter. Further, despite "repeated requests" from AT&T/Daniels, BEN never provided

3

AT&T with any documents "establishing how much cash on hand [BEN] might have for an equity investment and [its] ability to finance [its] bid." Id. at 272. Thus, AT&T was left to conclude that, unlike the other bidders, "BEN was looking for equity financing as well as debt financing." Id. at 680.

Despite the deficiencies in BEN's bid, AT&T allowed BEN to proceed into the second and final phase of the sale or auction process, during which bidders were allowed to perform due diligence and, if they chose to do so, refine their offers. See id. at 673, 675, 677 (noting that BEN "never really fully satisfied the cash on hand requirement, equity cash"). AT&T allegedly allowed BEN to do so for "political reasons," i.e., "some lobbying . . . was taking place in Congress on" a "bill . . . which was germane to AT&T's core long distance business." Id. at 677; see id. at 274, 460, 678. In other words, notwithstanding the deficiencies in BEN's initial bid, BEN was allowed to proceed to the second and final phase of the process because of its status as a minority-owned company.

AT&T ultimately evaluated each bid, including BEN's, on the basis of four criteria: (1) cash or valuation offered; (2) financial ability to close the transaction expeditiously; (3) track record of transactions; and (4) management team. Based upon these criteria, AT&T, after negotiations, awarded the systems in Illinois, Iowa and Missouri to Mediacom Communications, and the system in Nevada to Charter Communications. Mediacom's bid for the systems in Illinois, Iowa and

Missouri was collectively higher ($1,813,000,000.00) than BEN's bid for those same three systems ($1,810,300,000.00). Id. at 165-68, 170, 176, 673. Further, BEN's bid did not contain the financial information required by AT&T, i.e., detailing BEN's ability to consummate a transaction expeditiously.[1] As for the Nevada systems, Charter's bid was $535,000,000.00, approximately $135,000,000.00 higher than BEN's bid. Further, Charter's bid set forth in detail how it intended to finance the acquisition, whereas BEN's did not. AT&T also downgraded BEN's bid with respect to all four systems due to BEN's lack of experience in operating and managing cable television systems, and the lack of clarity regarding what personnel would actually manage the systems if BEN purchased them. In AT&T's view, BEN's lack of experience in this regard would likely have impacted its ability to obtain private equity funding. BEN formally disputed the outcome of the bids in March 2001. AT&T responded by outlining, in writing, the reasons for the outcome of the bidding process.

In the Spring of 2001, AT&T decided to sell a second group of systems located in Colorado, Montana, Wyoming and Utah (the Rocky Mountain systems).

---

[1] Mediacom's bid indicated that Mediacom "ha[d] over $900 million of unused and available lines of credit, providing significant debt capacity for acquisitions." App. at 173. In addition, Mediacom's bid indicated that Mediacom had retained three investment banks which, in a joint letter, "express[ed] a high degree of confidence in their ability to raise debt and public equity financing in the aggregate amount of up to $3.2 billion to complete the acquisition of the Systems . . . ." Id. at 174.

Daniels again contacted potential bidders about the sale and received indications of interest from potential bidders, including BEN. BEN expressed interest in purchasing three of the four Rocky Mountain systems. On May 25, 2001, Daniels sent a letter to BEN acknowledging its interest and advising it that it would "have to deliver satisfactory evidence of [its] ability to fund the transaction," such as "'highly confident' letters or similar evidence from [its] financial institutions . . . indicat[ing] the likelihood of successful funding." Id. at 201.

On June 11, 2001, Daniels sent a bid instruction letter to various potential purchasers, including BEN. The bid instruction letter emphasized AT&T's "objective [was] to maximize price," and it also advised that any bid "should include evidence of [the bidder's] financial ability to consummate the transaction expeditiously." Id. at 203-05. More specifically, the bid instruction letter stated that bids "must include 'highly confident' letters or similar evidence from [the bidder's] financial institutions . . . indicat[ing] the likelihood of successful funding" and "the anticipated timing of completing such funding." Id. Lastly, the bid instruction letter stated that each bid "must identify the organizational structure, management team and the technical expertise of the company." Id.

On June 25, 2001, BEN submitted a bid to purchase three of the four Rocky Mountain systems, i.e., Colorado, Wyoming, and Utah, for a collective price of $350,845,000.00. In addressing the issue of "Financing Sources and Conditions,"

6

BEN's bid stated that two entities, Robinson-Humphrey Investment Banking and Nedder, Moore & Associates, were "arranging financing for th[e] transaction," and BEN "authorize[d] AT&T and its agents to have discussions with" persons at these two entities (including, again, Sarkice Nedder) "regarding [BEN's] financing arrangements." Id. at 208. Otherwise, the bid provided no details as to BEN's plans for financing the purchase of the systems.

On June 25, 2001, Robinson-Humphrey, one of the entities listed in BEN's bid, sent a letter to Daniels stating that, as placement agent, it was confident it could "raise the financing required to consummate" BEN's acquisition of the systems. Id. at 211. The letter further stated that Robinson-Humphrey had "assembled an offering memorandum" which it had "distributed . . . to a list of leading providers of equity and debt capital to the cable and telecommunications industry." Id. Without providing any further details, the letter closed by stating "that the entire funding process w[ould] require approximately 120 to 180 days to complete." Id.

At some point in late June 2001, AT&T allegedly provided "guidance" to Bresnan Communications, one of the other bidders. In accordance with this "guidance," Bresnan raised its bid for the four systems from $650,000,000.00 to $750,000,000.00. BEN alleges it was not given any similar guidance, nor any opportunity to raise its bid. Ben does not dispute, however, that it bid on only

three of the four systems and it makes no assertion that it would have altered its bid to include all four systems.

On July 8, 2001, defendant Comcast Corporation (Comcast) made an unsolicited offer to purchase AT&T. As a result, AT&T's sale of its Rocky Mountain systems was put on hold, and all of the submitted bids, including BEN's, expired by their own terms. Comcast and AT&T entered into a merger agreement in December 2001.

In late January 2002, AT&T decided to proceed with the sale of its Rocky Mountain systems as quickly as possible. On January 31, 2002, Daniels, on behalf of AT&T, sent bid request letters to three entities, including BEN, that had previously expressed interest in purchasing those systems. The bid request letters asked for responses by February 4, 2002, indicating each bidder's "level of interest, an estimate of [its] valuation and [its] ability to close the transaction in an expeditious manner." Id. at 219. The bid request letters further stated:

> Your response should also include information outlining your financial ability to consummate the transaction expeditiously and how you propose to finance the transaction. Such information may include financial statements, highly confident letters or other proof of financing ability. In that regard, you should provide a list of contacts and telephone numbers for each of your debt and equity financing sources with whom you are arranging adequate financing, and authorize AT&T . . . and its agents to discuss your financing arrangements with these contacts.

Id.

8

BEN and other entities responded by submitting bids for the Rocky Mountain systems. In its response, BEN accused AT&T of discriminating against it in the bidding process, and specifically complained about the short deadline. BEN, however, stated that it was effectively resubmitting its expired June 25, 2001, bid for the Rocky Mountain systems. Attached to BEN's letter was a copy of its June 25, 2001, bid. Notably, that copy had been altered to delete information regarding BEN's proposed financing and proposed management team. When AT&T asked BEN about the deletion of its financing information, BEN responded: "we purposefully did not include confirmation of our financing because you have not confirmed to us that the original bid (last submissions were June 25, 2001) will continue." Id. at 278. BEN did, however, indicate it would "contact [its] financing sources to obtain the confirmation" requested by AT&T, id., and expressly requested a thirty-day extension of time "to adjust and supplement [its] bid in accordance to the new information" contained in AT&T's bid request letter. Id. at 135.

Although AT&T again had serious questions about the sufficiency of BEN's bid, particularly with regard to the financing details and the question of who would manage the systems, AT&T allowed BEN to proceed to the second and final phase of the bid process because of BEN's status as a minority-owned company, and AT&T's concern that it might be sued by BEN.

9

Employing the four criteria previously used in the first sale, AT&T ultimately ranked the bid submitted by Bresnan Communications as the highest. Compared to BEN's bid, Bresnan's bid was higher ($716,250,000.00 versus $350,845,000.00), included the requisite financing information, and covered all four of the Rocky Mountain systems (as opposed to BEN's bid, which proposed to purchase only three of the four systems). AT&T thus awarded the Rocky Mountain systems to Bresnan. According to the record, Comcast (the company that took over AT&T), "retained an equity percentage in the deal" and "became a partner with Bresnan in the deal." Id. at 648.

*Procedural background*

On March 3, 2003, BEN filed its complaint against AT&T, Daniels and Comcast asserting claims of racial discrimination under 42 U.S.C. § 1981, and state law claims for fraud, misrepresentation, breach of the covenant of good faith and fair dealing, interference with prospective economic advantage, and negligence.[2] Defendants responded by filing a motion to dismiss Comcast as a defendant and to dismiss all of BEN's state law claims. Defendants subsequently moved, before the district court had addressed their motion to dismiss, for summary judgment on all claims against them.

---

[2] BEN's complaint also included a claim of discrimination under 42 U.S.C. § 1982. That claim, however, is not at issue in this appeal.

10

On May 20, 2004, BEN, with leave of court, filed its first amended complaint, which added a claim of racial discrimination under Title VI of the Civil Rights Act of 1964. On that same date, BEN filed a brief in opposition to defendants' motion for summary judgment. Id. at 422. In support of its opposition brief, BEN filed reports from three expert witnesses it had retained to review the evidence in the case.

Defendants filed a second motion for summary judgment aimed at the Title VI cause of action contained in BEN's first amended complaint. On September 2, 2004, BEN filed an unopposed motion to augment the record in opposition to defendants' original motion for summary judgment. On September 3, 2004, the district court granted BEN's motion and accepted for filing the documents tendered by BEN in connection with its motion to augment the record. Id. at 818. The documents included full deposition transcripts of BEN's expert witnesses, as well as a large, unindexed group of documents pertaining to the sales of the cable systems.

On September 29, 2004, the district court issued a written order (1) dismissing BEN's claims for breach of the covenant of good faith and fair dealing, intentional interference with prospective business advantage, and negligence, (2) dismissing Comcast from the suit entirely, and (3) granting summary judgment in favor of AT&T and Daniels on BEN's claims for violation

11

of 42 U.S.C. § 1981, Title VI, fraud and misrepresentation.

## II.

*District court's grant of summary judgment*

In its first issue on appeal, BEN challenges the district court's grant of

summary judgment in favor of defendants on its claims for violation of 42 U.S.C.

§ 1981, Title VI, and under state law for fraud and misrepresentation. We review

de novo the district court's grant of summary judgment, applying the same legal

standard used by the district court. See Stover v. Martinez, 382 F.3d 1064, 1070

(10th Cir. 2004). Summary judgment is appropriate "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ.

P. 56(c). In applying this standard, we view the evidence and draw reasonable

inferences therefrom in the light most favorable to the nonmoving party. See

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

*a) Claim under 42 U.S.C. § 1981*

Section 1981 provides that "[a]ll persons . . . shall have the same right in

every State and Territory to make and enforce contracts . . . as is enjoyed by white

citizens." 42 U.S.C. § 1981(a). Section 1981 has been held to "prohibit[], when

12

based on race, the refusal to enter into a contract with someone . . . .” See

Patterson v. McLean Credit Union, 491 U.S. 164, 176-77 (1989), superseded by

statute on other grounds as stated in Landgraf v. USI Film Prods., 511 U.S. 244

(1994).

To date, this court has never addressed, in a published opinion, whether §

1981’s protections extend to minority-owned companies, such as BEN.[3]  See

Harris v. Farmers Ins. Exch., 64 Fed. Appx. 733 (10th Cir. 2003) (unpublished

decision implicitly assuming that plaintiff, a minority-owned company, was

protected by § 1981).  The parties and district court apparently assumed, however,

that BEN was protected by § 1981, and neither side has raised the issue on appeal.

Because, as addressed below, there are other grounds for affirming the district

court’s grant of summary judgment in favor of defendants, we will simply

assume, without deciding, that BEN was protected by § 1981.  See Webster v.

Fulton County, 283 F.3d 1254, 1256 n. 3 (11th Cir. 2002) (doing the same).

A careful review of the appellate pleadings and record on appeal

establishes that BEN’s claim of discrimination is not based on any direct evidence

of discrimination.  Rather, it is based solely on inferences to be drawn from

---

[3] Other circuits have held that § 1981 does protect minority-owned companies.  E.g., Gersman v. Group Health Ass’n, Inc., 931 F.2d 1565 (D.C. Cir. 1991) (concluding that corporation discriminated against on the basis of the race of its principal shareholder had standing to assert section 1981 violation), vacated on other grounds, 502 U.S. 1068, reinstated 975 F.2d 886 (D.C. Cir. 1992).

13

circumstantial evidence. Thus, BEN's claim of discrimination is governed, in the context of summary judgment, by the familiar burden-shifting analysis outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Exum v. United States Olympic Comm., 389 F.3d 1130, 1134 (10th Cir. 2004). Under that framework, BEN has the initial burden of establishing a prima facie case of discrimination. See id. "A prima facie case raises an inference of discrimination by eliminating the most common nondiscriminatory reasons for the defendant's conduct." Id. If BEN can establish a prima facie case of racial discrimination, the burden shifts to the defendants to offer some nondiscriminatory reasons for their actions. Id. at 1134-35. Finally, if the defendants satisfy this production burden, BEN must show that the defendants' proffered reason was a pretext for unlawful discrimination. Id. at 1135. "A plaintiff can show pretext by revealing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [defendants'] proffered legitimate reasons for its action such that a reasonable factfinder could rationally find them unworthy of credence." Id. (internal quotations omitted).

To establish a prima facie case of discrimination, BEN must, at a minimum, prove that (1) it was a minority-owned firm, (2) it submitted a bid for the cable systems that met the minimum bid specifications outlined by defendants, and (3) defendants awarded the systems to another bidder. See Brown v. Am. Honda

14

Motor Co., 939 F.2d 946, 949 (11th Cir. 1991) (applying § 1981 and the

McDonnell Douglas framework to situation involving bidding and awarding of

contract); T&S Serv. Assocs., Inc. v. Crenson, 666 F.3d 722, 725 (1st Cir. 1981)

(same).[4]

Considering these elements in light of the evidence contained in the record

on appeal, we conclude BEN has failed to establish a prima facie case of

discrimination.  To be sure, it is uncontroverted that BEN is a minority-owned

corporation and that the cable television systems were ultimately awarded by

defendants to other buyers.  The critical question, however, is whether the bids

submitted by BEN met the requirements outlined by defendants.  The first bid

invitation letter sent to BEN (concerning the sale of the first four systems)

expressly stated, under the heading "Financing Sources and Conditions," that

bidders were to "include in the[ir] Offer[s] a statement detailing [their] financial

ability to consummate the transaction expeditiously."  App. at 161.  Similarly, the

second bid invitation letter sent to BEN (concerning the sale of the Rocky

Mountain systems) stated, again under the heading "Financing Sources and

Conditions," that all offers "should include evidence of [the bidder's] financial

---

[4] The Third and Eleventh Circuits disagree on the precise elements that must be proven in order to establish a prima facie case of discrimination in a bidding situation.  We conclude it is unnecessary in this case to definitively decide those elements.

ability to consummate the transaction expeditiously" and "must include 'highly confident' letters or similar evidence from [the bidder's] financial institutions . . . indicat[ing] the likelihood of successful funding." Id. at 203. BEN's bid for the first set of systems, however, simply stated that "financing [wa]s being arranged" by two entities and listed one contact person for defendants to call regarding BEN's financing. Id. at 166. When contacted by Daniels, however, that person was unable to provide the specific financial information requested in the bid instruction letter. Id. at 156. Further, despite "repeated requests" from defendants, BEN never provided AT&T with any documents "establishing how much cash on hand [BEN] might have for an equity investment and [its] ability to finance [its] bid." Id. at 272. BEN's bid for the second set of systems was similarly flawed. Like BEN's first bid, it stated simply that two entities were "arranging financing for th[e] transaction," and BEN "authorize[d] AT&T and its agents to have discussions with" persons at these two entities "regarding [BEN's] financing arrangements." Id. at 208. Otherwise, the bid provided no details as to BEN's plans for financing the purchase of the systems. Thus, given these shortcomings in BEN's bids, we conclude that BEN failed to satisfy the minimum bid requirements outlined by defendants.

Even assuming, for purposes of argument, that BEN could establish a prima facie case of discrimination, it is clear that defendants have satisfied their burden

16

of producing legitimate, nondiscriminatory reasons for awarding the bids to other companies.  As noted, AT&T and Daniels evaluated the bids using four criteria: (1) cash or valuation offered; (2) financial ability to close the transaction expeditiously; (3) track record of transactions; and (4) management team.  On each of these criteria, BEN's bid was less advantageous to defendants than bids submitted by other entities.  Although the amounts bid by BEN for the various systems were competitive, they were not the highest bids in terms of the cash or valuation offered.  Further, unlike the entities that were ultimately awarded the systems, each of whom had previously purchased and operated cable television systems, BEN had no track record of purchasing or operating any cable television systems.  Likewise, defendants downgraded BEN's bid for the first set of systems because of BEN's failure to clearly indicate what personnel would actually manage the systems if they were sold to BEN.  And, in its bid for the second set of systems, BEN omitted altogether any description of what personnel would manage the systems if BEN purchased them.  Finally, and perhaps most critically, BEN's bids for both sets of systems were, as discussed above, critically deficient in terms of describing, in detail, the nature of BEN's financing arrangements.  In contrast, the bids from the winning entities outlined, in substantial detail and as required by the bid instruction letters, the amounts and types of financing that had

17

been arranged to purchase the systems.[5]

Because defendants have satisfied their burden of producing legitimate, nondiscriminatory reasons for awarding the systems to other bidders, BEN bears the burden of presenting evidence establishing that defendants' proffered reasons were pretextual. In attempting to do so, BEN relies exclusively on affidavits and deposition testimony from three purported expert witnesses: (1) Matthew L. Liebowitz, a Miami-based attorney specializing in communications and telecommunications law; (2) Marilyn Lashner, who holds a Ph.D. in Communications and describes herself as "a specialist in English syntax and content analysis of communications," App. at 469; and (3) Alan Wallace, a licensed California real estate broker and attorney. These three witnesses were hired by BEN to review the evidence in the case and provide their "opinions" concerning defendants' conduct. The district court rejected this expert testimony, however, as "conclusory *ipse dixit* . . . ." Id. at 2170. More specifically, the district court, quoting our decision in Dodge v. Cotter Corp., 328 F.3d 1212, 1222 (10th Cir. 2003), concluded "there [wa]s simply too great an analytical gap between the data and the opinion[s] proffered." Id. Further, the district court

---

[5] As noted by the district court in its order granting summary judgment, "BEN simply lost out for ostensibly good reason, principally for failing to provide persuasive assurances from the financial community that it had sufficient capital behind it to consummate the transactions it bid on totaling hundreds of millions of dollars." App. at 2169-70.

18

concluded that "BEN's experts' efforts to deconstruct the bidding process to suggest" racial discrimination "fail[ed] as a matter of law." Id. at 2171.

It is not entirely clear to us whether the district court intended to characterize the proffered opinions as inadmissible, or whether it simply found them unconvincing. Assuming, for purposes of argument, that the district court simply found the proffered expert opinions unconvincing, we agree. BEN's expert witness Matthew Liebowitz, a Miami-based attorney allegedly specializing in communications law, attempted to challenge the four criteria utilized by defendants in assessing the submitted bids. With respect to the issue of cash or valuation offered, Liebowitz agreed that "the use of 'highly confident financial letters'" was "consistent with numerous transactions in the industry," and did not otherwise assert that BEN's bids satisfied this standard. App. at 462. With respect to the issue of "[f]inancial ability to close a transaction expeditiously," Liebowitz again acknowledged that this was "clearly a valid concern for any seller . . . ." Id. Although Liebowitz opined that the "120-180 day time frame" estimate given by BEN's financing entities to defendants was "well within reason," he does not dispute that the details of BEN's financing arrangements were otherwise unsettled, thereby undermining defendants' confidence that BEN

19

could, in fact, close on the transactions expeditiously.[6] Id. With respect to the issue of BEN's prospective management team, Liebowitz effectively acknowledged that many of them were prospective, rather than actual, employees of BEN. Id. at 463-64. Although Liebowitz attempted to downplay this fact by stating that "[r]arely would start-up companies . . . have the ability to have full management in place since this would be very costly," id. at 464, this does not truly undercut defendants' expressed concern about the uncertainty of BEN's management team.

Alan Wallace, a California-based real estate broker and attorney, was also hired by defendants to review the evidence and provide opinions regarding the case. Although none of Wallace's formal opinions concerned the alleged discrimination, his report did allege that AT&T's statement to BEN that it "ha[d] little or no experience in large cable system acquisitions" could "only be interpreted to mean that [BEN's] ownership lacked the experience and that [defendants] would not sell large blocks of SYSTEMS to anyone but those in the elite of cable systems ownership, thus totally and intentionally precluding racial and ethnic minority-ownership." Id. at 509. Aside from the fact that this

---

[6] Although BEN's financing source apparently issued a "highly confident letter" on or about June 25, 2001, that letter effectively expired due to Comcast's takeover of AT&T. When the bidding process for the Rocky Mountain systems was renewed in January 2002, BEN did not resubmit another "highly confident letter" from its financing source.

allegation was not couched by Wallace as a formal opinion, this allegation is little more than an inference drawn from the uncontroverted facts. More importantly, Wallace makes no attempt to undercut the legitimate concerns expressed by defendants regarding BEN's ability to obtain financing and close the deal expeditiously, or the uncertainty of BEN's prospective management team.

BEN's third and final expert witness, Marilyn Lashner, allegedly "perform[ed] a research project involving content analysis of deposition testimony of selected executives affiliated with" defendants. App. at 471. According to Lashner's report, the purpose of her analysis "was to document the attitudes and conduct of said executives . . . with respect to their dealings with [BEN] during the course of the bidding process and sale of" the cable systems at issue. Id. Based on the results of her "research," Lashner concluded that: (1) "routinely, in the course of negotiations, the executive responsible for acquisitions and divestitures at AT&T . . . would cajole, flatter, wheedle, and otherwise, exploit bidders in ways that, knowingly, were less than moral," id. at 472; (2) "[t]hat, in accordance with what appeared to be policy decisions that had been crafted at the highest administrative levels, executives at [defendant AT&T and its parent company] . . . pressed their lower level administrator . . . and an executive for [Daniels] . . . with demands that [BEN] be included in the second round of bidding even though, in their minds, BEN had not satisfied the fundamental

21

requirement of financial accountability for the first or the second group of systems," id. at 473; (3) "[t]hat the conduct demonstrated by AT&T . . . toward [BEN] was scheming, crafty, cunning; and artfully contriving – all the while using the group's presence in the bidding process as a strategy to satisfy such self-serving objectives as . . . creating an image that would imbue the communications giant with humanity and munificence thereby assisting them in lobbying [C]ongress for legislation germane to their business, and . . . protecting against the potential of a law suit by [BEN]," id. at 474; (4) "[t]hat, unlike their stance with the first set of systems, executives at the highest levels of AT&T . . . pressed their lower level administrator . . . and executives at the highest level of their agent [Daniels] . . . with demands that [BEN] be indulged with the opportunity to do on-site due diligence and to bid for the second set of systems, even after BEN remained without significant change with respect to financial accountability," id. at 475; (5) "[t]hat, even as executives from AT&T . . . and Daniels . . . actively encouraged [BEN] . . . to compete in the bidding process toward winning control of the second set of systems, [defendants] were disingenuous in their encouragement in that they knew, without doubt, that BEN had no chance of being awarded said systems," id. at 477; and (6) that all of the foregoing "demonstrate[d] direct evidence of discrimination against [BEN] . . . ." Id. at 478. Aside from the highly questionable validity of Lashner's "research," it is

22

apparent that she not only fails to undercut the rationales offered by defendants for rejecting BEN's bids, but in fact supports those rationale. In particular, Lashner acknowledges that BEN's bids were deficient in the area of financing details. Further, Lashner's assertion of "direct evidence of discrimination against" BEN has nothing to do with defendants' reasons for rejecting BEN's bids, and instead is based on the fact that defendants allowed BEN to proceed further in the bidding process than it otherwise would have had it not been a minority-owned business.

In sum, we conclude the reports and deposition testimony from BEN's experts were insufficient to create a genuine issue of material fact concerning whether the reasons offered by defendants for their decisions were pretextual. Indeed, we agree with the district court that BEN's evidence simply confirms that BEN's status as a minority-owned company actually allowed it to proceed further than it otherwise would have in the bidding process. In other words, the evidence establishes that defendants, in an attempt to gain political favor with members of Congress, allowed BEN to proceed in the bidding process despite the fact that BEN's bids were patently deficient. Although this motive on the part of defendants may be questionable, it does not mean that defendants' ultimate decision as to who to award the systems to was affected by race. To the contrary, the evidence in the record establishes that in each instance, defendants awarded

the systems to bidders with distinct advantages over BEN. Thus, BEN has failed to present sufficient evidence to create a genuine issue of material fact on the ultimate question of whether defendants intentionally discriminated against BEN in the awarding of the systems.

*b) Claim under Title VI*

Title VI of the Civil Rights Act of 1964 provides, in pertinent part, "that no person shall, 'on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity' covered by Title VI." Alexander v. Sandoval, 532 U.S. 275, 278 (2001). This portion of Title VI "prohibits only intentional discrimination," and may be enforced by private individuals via lawsuits. Id. at 280. Like a claim of discrimination under § 1981, a claim of discrimination under Title VI is analyzed using the burden-shifting analysis outlined in McDonnell Douglas. E.g., Freeman v. Fahey, 374 F.3d 663, 666 (8th Cir. 2004). Ultimately, "a plaintiff must demonstrate that there is a genuine issue of material fact that the program receiving federal assistance acted with discriminatory intent or motive to survive summary judgment on a Title VI claim." Cudjoe v. Indep. Sch. Dist. No. 12, 297 F.3d 1058, 1069 (10th Cir. 2002).

For the reasons outlined above in the discussion of BEN's § 1981 claim, we conclude that BEN has failed to produce sufficient evidence from which a

reasonable jury could find that defendants acted with discriminatory intent or motive in refusing to award the systems to BEN.

*c) Fraud and misrepresentation*

BEN asserted state law claims against defendants for fraud and misrepresentation, alleging, in pertinent part, that "[t]he representations made by DEFENDANTS throughout both bidding processes that" they would "accept[] an offer which represented the highest and best value with the fewest conditions to closing, were false and misleading . . . ." App. at 21. The district court, applying Colorado law (the law of the forum state), concluded that BEN had failed to present sufficient evidence to withstand summary judgment on either of these claims. BEN challenges this conclusion on appeal.

Under Colorado law, the following elements must be established in order for a plaintiff to prevail on a claim of fraud: (1) a false representation of a material existing fact, or a representation as to a material existing fact made with a reckless disregard of its truth or falsity; or a concealment of a material existing fact, that in equity and good conscience should be disclosed; (2) knowledge on the part of the one making the representation that it is false; or utter indifference to its truth or falsity; or knowledge that he is concealing a material fact that in equity and good conscience he should disclose; (3) ignorance on the part of the one to whom representations are made or from whom such fact is concealed, of

25

the falsity of the representation or of the existence of the fact concealed; (4) the representation or concealment made or practiced with the intention that it shall be acted upon; and (5) action on the representation or concealment resulting in damage. Morrison v. Goodspeed, 68 P.2d 458, 462 (Colo. 1937).

To prevail on a claim of negligent misrepresentation under Colorado law, a plaintiff must establish "that the defendant supplied false information to others in a business transaction, and failed to exercise reasonable care or competence in obtaining or communicating information on which other parties justifiably relied." Mehaffy, Rider, Windholz & Wilson v. Cent. Bank, N.A., 892 P.2d 230, 236 (Colo. 1995). Further, the plaintiff must establish that it lost money due to the defendant's misrepresentation. Id.

After reviewing the record on appeal, we conclude that BEN failed to produce sufficient evidence from which a jury could reasonably have determined that defendants falsely represented they would "accept[] an offer which represented the highest and best value with the fewest conditions to closing . . . ." App. at 21 (complaint detailing fraud claim). To the contrary, the evidence contained in the record overwhelmingly indicates that this representation was, in fact, true, and that defendants indeed selected the bids that offered the "highest and best value with the fewest conditions to closing," none of which were submitted by BEN. Thus, we conclude the district court properly granted

26

summary judgment in favor of defendants on these claims.

*District court's grant of motion to dismiss*

BEN also challenges on appeal the district court's decision to dismiss (1) all claims asserted by BEN against Comcast, (2) BEN's claims against AT&T and Daniels for breach of the covenant of good faith and fair dealing, and (3) BEN's claims against AT&T and Daniels for negligence (i.e., negligent breach of the duty of good faith and fair dealing).[7]  We review de novo a district court's grant of a motion to dismiss.  La Resolana Architects, PA v. Clay Realtors Angel Fire, 416 F.3d 1195, 1198 (10th Cir. 2005).  We "will uphold dismissal 'only when it appears that the plaintiff can prove no set of facts in support of the claims that would entitle the plaintiff to relief.'"  Mowry v. United Parcel Serv., 415 F.3d 1149, 1151-52 (10th Cir. 2005) (quoting Deck v. Engineered Laminates, 349 F.3d 1253, 1256 (10th Cir. 2003)).  We "must accept all well-pleaded allegations in the complaint as true and construe them in the light most favorable to the plaintiff." Id. at 1152.

*a) Claims against Comcast*

The district court dismissed Comcast as a defendant from the suit because,

_____

[7] The district court also dismissed BEN's claim for interference with business advantage.  BEN, however, makes no mention of that claim in its opening brief and therefore presumably does not appeal the district court's ruling on that claim.

after reviewing BEN's complaint, it concluded that BEN had "not assert[ed] [any] identifiable wrongful conduct by Comcast." App. at 2162. Although BEN appears to be challenging this ruling on appeal, its opening appellate brief contains only two references to Comcast. First, in the "Statement of Facts" section of its opening appellate brief, BEN alleges, in a bullet point heading, that it "[e]stablished a [c]ontractual [r]elationship with and [r]atification by Comcast." Aplt. Br. at 27. Underneath this heading, BEN simply quotes from the report of Allan Wallace, one of its expert witnesses, that "Comcast 'by intervening in the late bids and calling for a new bid using the same process entered into a contractual relationship with Plaintiff . . . [and] in continuing the same process, Comcast ratified the entire second round process . . . .'" Id. (quoting portions of record). Later in its brief, BEN asserts that "Comcast ratified the second-round decisions made by AT&T and Daniels," and that "Comcast became a[n] assignee of the winning second-round bid and contract, and thus, was responsible on that level too." Id. at 44.

Clearly, these references and allegations are insufficient to demonstrate why the district court's dismissal of Comcast was improper. More specifically, BEN does not dispute the district court's conclusion that neither BEN's original complaint nor its amended complaint alleged any wrongdoing on the part of Comcast. Thus, we affirm the district court's ruling.

28

*b) Breach of covenant of good faith and fair dealing*

In dismissing BEN's claim for breach of the covenant of good faith and fair

dealing, the district court stated as follows:

> BEN has not identified in the pleadings any contract between the
> parties. Indeed, BEN has never pled any breach of express or
> implied contract (except as to the covenant of good faith and fair
> dealing). An invitation to BEN was extended to bid on the purchase
> of cable systems. BEN responded and ended up purchasing nothing.
> BEN offers no factual averments that establish any commitment by
> either side to do anything for the other. Indeed, the gravamen of the
> complaint is that BEN wanted to enter into a contract or two with
> defendants, which would have occurred but for defendants' improper
> motives.
>
> The averments of ¶¶ 18 and 35 of the Amended Complaint do
> reference alleged agreements "to submit an 'indication of interest
> proposal' for the purchase of all or some of AT&T's SYSTEMS" and
> "whereby PLAINTIFF would submit a 'first round' bid for fair
> consideration by AT&T and DANIELS over the remaining
> SYSTEMS." But such vague and conclusory characterizations at
> most rise to the level of unenforceable agreements to agree."
> (citations omitted). In particular, a bid is not a contract and remains
> only a[n] offer until such time as it is accepted. (citation omitted).
>
> There can be no breach of the covenant of good faith and fair
> dealing under Colorado law where there is no underlying contract.
> (citation omitted). As noted in <u>Bayou Land Co. v. Talley</u>, 924 P.2d
> 136, 154 (Colo. 1996): "Generally, the implied covenant of good
> faith and fair dealing is used to effectuate the intention of the parties
> or to honor their reasonable expectations in entering into the
> contract." Therefore the Court GRANTS the motion . . . as to the
> fourth claim for relief.

App. at 2159-60.

BEN's appellate challenge to this ruling is, at best, conclusory. Notably,

BEN makes no reference to the allegations in its complaint, nor does it cite to a single case. Instead, BEN's opening brief states simply "there were several contracts formed on the unique auction setting" because "there were clear and definite terms, capable of acceptance and contractual duties flowing from seller, agent, buyer relationship." Aplt. Br. at 47. As for the alleged breach of the covenant of good faith and fair dealing, BEN states:

> BEN provided evidence of the existence of the covenant of good faith and fair dealing, both contractual and tortuous. What stands out is that winning bidders entered the auction with the business expectation that there was a covenant of good faith, the process would be fair and that they would be treated fairly. Their expectation that the covenant controlled the auction process was developed over a period of many years entering into these types of transactions.

Id.

Given the conclusory nature of these arguments, we could summarily reject BEN's challenge to the district court's dismissal of its claim for breach of the covenant of good faith and fair dealing. E.g., Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1547 (10th Cir. 1995) (noting it is insufficient merely to state in one's brief that one is appealing an adverse ruling below without advancing reasoned argument as to the grounds for appeal); Murrell v. Shalala, 43 F.3d 1388, 1389 n.2 (10th Cir. 1994) (holding that "perfunctory complaints fail to frame and develop an issue sufficient to invoke appellate review"). We will proceed, however, out of an abundance of caution, to briefly review the merits of BEN's

30

claim for breach of good faith and fair dealing.

To the extent BEN is characterizing its claim as one sounding it tort, it clearly fails under Colorado law. See Harrison v. Wahatoyas, L.L.C., 253 F.3d 552, 560 (10th Cir. 2001) (reaching same conclusion); Wells Fargo Realty Advisers Funding, Inc. v. Uioli, Inc., 872 P.2d 1359, 1362 (Colo. Ct. App. 1994) (noting that Colorado law recognizes a cause of action sounding in tort for bad faith breach of an insurance contract, but otherwise there is no independent tort action under Colorado law for breach of implied duty of good faith and fair dealing).

To the extent BEN's claim is one sounding in contract, BEN's complaint did, in a section entitled "NATURE OF THE CASE," allege the existence of three "agreements" between BEN and defendants: (1) "[o]n or about November 17, 2000, DANIELS . . . contacted [BEN] by letter, entering into an agreement with [BEN] to allow [BEN] to submit an 'indication of interest proposal' for the purchase of all or some of AT&T's SYSTEMS," App. at 14-15, (2) "on or about January 16, 2001 DANIELS, on AT&T's behalf, contacted [BEN] by letter inviting [BEN] to submit a final bid and entering into an agreement with [BEN] to allow [BEN] to submit a formal offer to buy SYSTEMS no later than January 30, 2001," id. at 16, and (3) "AT&T and DANIELS then invited [BEN] to enter into another agreement whereby [BEN] would submit a 'first round' bid for fair

31

consideration by AT&T and DANIELS over the remaining SYSTEMS . . . ." Id. at 18. Presumably, these were the agreements out of which the duty of good faith and fair dealing arose (although this is not at all clear from the allegations contained in BEN's complaint). The problem, however, is that none of these allegations, assuming they are true, would have given rise to an enforceable contract under Colorado law. Under Colorado law, "[a]n enforceable contract requires mutual assent to an exchange, between competent parties, with regard to a certain subject matter, for legal consideration." Indus. Prod. Int'l, Inc. v. EMO Trans, Inc., 962 P.2d 983, 988 (Colo. Ct. App. 1997). Although defendants invited BEN to submit bids for the systems at issue, those were not "operative offer[s]" for purposes of forming a contract. O.C. Kinney, Inc. v. Paul Hardeman, Inc., 379 P.2d 628, 631 (Colo. 1963). Rather, BEN's bids "constituted the offer[s] and it would [have] take[n] defendant[s'] acceptance to complete a contract." Id. Moreover, defendants' invitations to submit bids were unilateral acts on the part of defendants, and they offered BEN no consideration for its submission of bids, nor did they receive any consideration back from BEN (other than the bids themselves), and BEN does not allege otherwise.

For these reasons, we conclude the district court properly granted defendants' motion to dismiss BEN's claim for breach of the covenant of good faith and fair dealing.

*c) Negligence*

In its claim for negligence, BEN alleged that defendants "had a duty to exercise good faith and deal fairly with" BEN, and that defendants "negligently breached said duty of good faith and fair dealing by performing the acts alleged [in the complaint] and failing to exercise due care and act reasonably." App. at 23. BEN's complaint failed, however, to identify whether the alleged duties were grounded in contract or tort. The district court, in addressing defendants' motion to dismiss this claim, concluded that it "constituted a variation of the theme set forth in" BEN's claim for breach of the covenant of good faith and fair dealing, and thus "fail[ed] for the same reason as [that claim]–no underlying enforceable contract." Id. at 2161. The district court further concluded that, "[t]o the extent, if any, the . . . claim differ[ed] from the [breach of covenant claim] by alleging some other negligence by the defendants in the bid consideration and award process, it . . . fail[ed] as a matter of law due to a lack of any cognizable common law duty of care on the part of defendants in the course of evaluating bids." Id.

We conclude the district court properly granted summary judgment in favor of defendants on this claim.[8] To the extent the alleged duty arose out of an

---

[8] Although BEN briefly mentions the negligence claim in its opening brief, it simply states, without citation to any authority, that "professional duties were owed, grounded in common law tort principles, to Plaintiff on negligence theories and the Defendants breached that duty." Aplt. Br. at 48. Again, BEN has

(continued...)

33

alleged contract between BEN and defendants, it is clear, for the reasons discussed above, that BEN has failed to allege or prove the existence of an enforceable contract between itself and defendants. To the extent the alleged duty is based on Colorado tort law, BEN has failed to cite to any Colorado authority indicating that a person or entity soliciting or evaluating bids owes a duty of good faith and fair dealing to those persons or entities submitting bids.

The judgment of the district court is AFFIRMED.

Entered for the Court

Mary Beck Briscoe
Circuit Judge

---

[8](...continued)
arguably failed to frame and develop the issue in a sufficient manner to invoke appellate review.

34